# Bank of Pennsylvania *versus* The Commonwealth.

1. Assuming an act of incorporation of a bank to be a contract between the State and the stockholders, the construction of such a contract is strict against the corporation and liberal in favor of the State.

2. A bank acquires no privilege, exemption, or immunity under its charter, except what are given expressly and unequivocally. Corporate privileges are never implied.

3. The Legislature can only disarm the state of any portion of the sovereign power which belongs to her, by words showing that to be the intention in words so plain that they cannot be misunderstood.

4. The taxing power is an incident of the state's sovereignty, and the state does not lose it by a charter which says nothing on the subject.

5. Construction of the Act of 1830, extending the charter of the Bank of Pennsylvania.

6. The principle laid down in The Easton Bank *v.* Commonwealth (10 *Barr* 442), reaffirmed.

7. The Court, in construing an act of incorporation, will not look to what occurred when it was on its passage through the Legislature. Such evidence is not only valueless, but delusive and dangerous.

ERROR to the Common Pleas of *Dauphin county*.

This was an appeal by the defendants, the President, Directors, and Company of the Bank of Pennsylvania, from the settlement of an account against the Bank made by the Auditor-General and State Treasurer, under the provisions of the Act of 30th March, 1811, relating to the settlement of public accounts. On the 15th April, 1851, those officers settled an account against the Bank, in which they stated a balance in favor of the Commonwealth of $51,068.75. It was for taxes upon dividends declared by the Bank in the years 1848, 1849, 1850, and the first quarter of 1851.

The material question in the case was, whether the Bank of Pennsylvania, by virtue of the provisions of the third section of the Act of 11th April, 1848, was liable for the graduated tax on bank dividends imposed by the first section of the Act of 1st April, 1835.

On the part of the Commonwealth it was alleged, that the Bank was liable to such taxation by virtue of the third section of the Act of 11th April, 1848 (*Acts of* 1848, p. 512). The third section of that Act is as follows: "That all banks of this Commonwealth, whose charters have been extended or renewed, or whose charters shall hereafter be extended or renewed, are hereby made subject to the graduated tax upon dividends provided for by the Act relating to banks, passed *April first*, one thousand eight hundred and *thirty-five*, except in cases *where there is an express exemption in the Act extending or renewing such charter*."

[Bank of Pennsylvania v. The Commonwealth.]

The first section of the Act of 1st April, 1835, referred to in the Act of 1848, provided as follows: "The several banks in the Commonwealth now subject by law to the payment of a tax on their dividends, shall hereafter pay into the treasury of this Commonwealth in the manner now directed by law, eight per cent. on all dividends which do not exceed six per cent. per annum: on dividends exceeding six per cent., and not exceeding seven per cent. per annum, a tax of nine per cent. on such dividends; and on dividends exceeding seven per cent. per annum, and not exceeding eight per cent., the said banks shall pay a tax of ten per cent.; and on dividends exceeding eight per cent. per annum, such banks shall pay a tax of *eleven per cent.: Provided*, That the provisions of this act shall *not* include the Girard Bank," and others enumerated, not including in such enumeration the Bank of Pennsylvania. (*Acts of* 1835, p. 99,) *Purdon*, title "Banks."

A further Act was passed on 15th March, 1849 (*Acts* p. 168), the seventh section of which provided, "That in lieu of the tax *now imposed* by law on dividends of banks and savings institutions, which may have been rechartered, or which may hereafter be chartered or rechartered, as well as all banks and savings institutions now subject to a tax on dividends, shall hereafter pay into the treasury of this Commonwealth, in the manner now directed by law, &c. (viz. the same tax imposed by the Act of 1835, till the dividends exceed eight per cent.), then on all dividends exceeding eight, and not exceeding nine per cent., a tax of *twelve* per cent.," &c., increasing the tax on the increasing dividends, till it imposed on all dividends exceeding twenty per cent., a tax of thirty per cent.

The Bank of Pennsylvania was originally incorporated for twenty years, in pursuance of an Act passed 30th March, 1793. By the first section of the Act of 13th March, 1830, its charter was extended twenty-five years, from the expiration of the term to which it was then limited, viz. till 4th March, 1858. By sec. 3, its capital was increased.

By sec. 8 of the Act of 1830, the Bank was required to loan to the Commonwealth a sum or sums of money, in the whole not exceeding four millions of dollars, at a premium of 5½ per centum, the bonus to be paid into the state treasury in instalments of not less than $334,000 in each of the *months* next ensuing the acceptance of the Act.

By the ninth section, the Bank was required to lend to the Commonwealth one million of dollars annually, for three years after the 1st of January, 1831, at the rate of five per centum per annum, &c.

By the tenth section, the business and duties of the Commissioner of Loans was to be transferred to the Bank of Pennsylvania, by

which it was to be performed, without compensation or charge to the Commonwealth or individuals. *Acts of* 1830, p. 86, &c.

*This Act did not exempt the Bank from taxation.*

The Bank denied its liability to pay the taxes, and appealed from the settlement to the Court of Common Pleas of Dauphin county. The specification of objections, filed on the part of the Bank, to the said settlement, were as follows:—

1st. They object to the settlement of this account against the Bank, because the said Bank is *legally exempt* from the payment of tax upon dividends, in the Act renewing and extending its charter. (Viz., the Act of 13th March, 1830.)

2d. They object, because to give the words "*expressly exempt*" used in the third section of the Act of the 1st of April, 1848, "relative to the taxation of bank dividends," any other construction than that of "*legally exempt*," would be to make the state do what is forbidden by the Constitution of the United States.

3d. They object, because the *intention* of the Legislature to exempt the Bank from such tax, in the Act extending and renewing its charter, is *necessarily implied*, not only from the Act itself, but from circumstances occurring at the time of its passage, and recorded in the public archives; from contemporaneous legislation on the same subject; and from the uniform construction and perfect understanding of both parties from the time the law passed until *the 8th of February last*.

4th. The charter is a contract between the state and the Bank, the obligations of which cannot be impaired without violating the Constitution of the United States.

5th. The charge of interest is wrong, the Bank not being liable for interest until three months after a balance settled against it; the *calculation*, also, is inaccurate.

On the trial, there was given in evidence on the part of the Bank:

1st. The proclamation of the Governor, issued October 15, 1829, calling an extraordinary session of the Legislature, in order that they may adopt such measures as shall be thought necessary to fulfil the engagements entered into on the part of the state. 2d. The message of the Governor, read November 4, 1829. 3d, For the purpose, as alleged, of showing the consideration paid by the Bank to the Commonwealth, in purchase of the present charter, and the understanding of the contracting parties that nothing further was to be exacted in the shape of tax or otherwise, there were offered portions of the journals of the House of Representatives, kept at the session of 1829–30, during which session the charter of the Bank of Pennsylvania was extended: also letters by the Secretary of the Commonwealth to banks, &c., soliciting loans, and the answers to them: also, report, by the Committee of

Ways and Means, of the bill to authorize a loan, and to continue for a further time " An Act to incorporate the subscribers to the Bank of Pennsylvania." It was alleged that the Bank had not made any application for an extension of its charter. They also offered various proceedings in the House on the bill reported. One object was to show that the bill was referred to the Committee of Ways and Means, to amend the same so as to exempt the Bank from the payment of a tax of 8 per cent. upon its dividends, to which it was made subject when before *the committee of the whole.* The bill was reported from the Committee of Ways and Means, as directed by the House, exempting the Bank from the tax upon its dividends. When the bill was again before the *committee of the whole,* the tax of 8 per cent. upon its dividends was inserted; and when the bill came before *the House* upon second reading, the tax of 8 per cent. on its dividends was stricken out, and there was inserted 5½ per cent. premium upon a loan of four millions, which it was required, by the eighth section of the Act, to loan to the Commonwealth. In that manner the bill passed the House and the Senate, and was approved by the Governor. It was afterwards accepted at a meeting of stockholders of the Bank.

4th. Reference was made to various Acts of Assembly passed at different times, to show the practice prevailing in the Legislature when it was intended *to reserve* the power of taxing incorporated banks, *in futuro,* and of altering or otherwise interfering with their charters; also to show that a tax on dividends to be declared in future, was regarded as the consideration of the franchise of banking in each particular case.

5th. The original act incorporating the Bank of Pennsylvania, and the supplements thereto, to show the consideration paid by the Bank for its charter, and that the Bank was regarded as a corporation not subject to future taxation.

6th. The Act of June 11, 1840, imposing a tax on the capital stock paid in of banks, the tax to be retained by the cashiers, &c., from the dividends or profits. It was conceded that the Bank of Pennsylvania had paid this tax, but its liability for it was denied.

On the part of the *Commonwealth,* reference was made to the third section of Act of 15th April, 1835, providing that if the Mechanics' Bank of Philadelphia accept of the provisions of the section, then the charter shall be extended twenty years, and the capital stock may be increased, " and the said bank shall be free from any tax or other charge whatever, during the continuance of this charter." Also to Act relative to Mechanics' and Manufacturers' Bank of Northern Liberties; *Acts of* 1835-6, p. 504. A bonus of $30,000 required for renewal of its charter, but the Bank was afterwards subjected to taxation. Other Acts were referred to. It was admitted that the state owned three-fourths of the capital stock of the Bank of Pennsylvania until the year 1843, when its stock was sold.

PEARSON, P. J., in his charge, declared that in construing the law it was right to take into consideration the state of the country at the time, and to look into other acts passed in *pari materia;* but that it was not proper to examine the journals or consider the intention of particular members, or of either branch of the law-making power. He instructed the jury to render a verdict in favor of the Commonwealth, for the amount of taxes claimed on the dividends of the Bank down to and including that of July, 1850, with interest thereon from 15th July, 1851, being three months after the settlement by the accounting officers.

It was assigned for error, 1. That the Court erred in charging the jury that all the evidence given on the part of the plaintiff in error, outside the Act of Incorporation, ought to be discarded from the consideration of the Court and jury. 2. In saying that when endeavoring to ascertain the meaning of the Act incorporating the Bank, and the consideration paid therefor, the Court had no right to examine the journals of the Legislature. 3. In charging that there is nothing discoverable in the Act of 1830, extending the charter of the Bank, by which it is exempted from future taxation, either expressly or by implication. 4. In charging that the tax on dividends levied by the Act of 1848, and the several acts to which it is supplementary, is not a tax on the franchise of banking, conceded by the charter of defendant below, but upon the property of the stockholders. 5. In charging that the Act of 1848, as applied to the defendant below, is not in violation of any contract made by the Commonwealth with the Bank of Pennsylvania, and, consequently, is not unconstitutional and void. 6. In instructing the jury to find a verdict for the plaintiff, in disregard of all the evidence put in by the defendant below on the trial.

The case was argued by *Bell* and *Mallery*, for the Bank.—The material question is, whether, by the Act of 11th April, 1848, the Bank of Pennsylvania is liable to the graduated tax on its dividends imposed by the Act of 1st April, 1835. The phrase in the first section of the Act of 1848, relied on upon the part of the Commonwealth, viz. " except in cases where there is an express exemption in the Act extending or renewing such charter," it was submitted, might be construed to mean " clear" or " plain." If so, and the Court, from the Act of 1830, incorporating the Bank, or from it in connection with contemporaneous evidence, can perceive a clear intent to exempt the Bank from future taxation, the constitutional question may not arise.

It was contended, that the Act of 1848, if designed to affect the Bank of Pennsylvania, was unconstitutional. The parties to the contract were the stockholders, in their individual cha-

[Bank of Pennsylvania v. The Commonwealth.]

racter, and the state: Providence Bank v. Billings, 4 *Peters' Rep.*
523–4.   In relation to the constitutional question, reference was
made to the case above referred to: 4 *Wheaton* 575, Dartmouth
College v. Woodward; 6 *Barr* 86, Brown v. Hummel; 10 *Barr*
449, Commonwealth v. Easton Bank; 7 *Ohio* 125; 7 *Yerger* 490.

It was admitted that a relinquishment of the taxing power is
not to be assumed; an intent to abandon ought to appear.   But
the contract to relinquish it may be shown *by necessary implication*:
2 *Story on the Const.* § 1371.

It was contended that the action of the house was legitimate
evidence to be submitted to the jury on the question of considera-
tion paid for the charter.

In the case of Gordon v. The Appeal Tax Court, 3 *Howard*
113, it was decided that the right of banking is a franchise, which
is not taxable as such, if a price has been paid for it, and accepted
by the Legislature.   A distinction is there taken between the *fran-
chise*, as a subject of taxation, and the *corporate property* of the
Bank; which latter, it is said, may be taxed, unless there is a
special agreement to the contrary.

*Purviance* and *McCormick*, for the Commonwealth.—The case,
on the part of the Bank, rests upon the argument, 1. That the
Act of 1848 was not designed to embrace the Bank of Pennsyl-
vania; 2. That if it were so intended, the Act is unconstitutional.
It is assumed, on the part of the Bank, that there was a contract
between the Commonwealth and the Bank, in the Act of 1830,
that the Bank should be exempted from taxation.   But there is no
evidence that the four million loan was regarded as a *bonus;* it
was given to the Bank because the state was the holder of a large
amount of its stock.   But the Act alone is to be looked to in deci-
ding the question as to whether there was such a contract.   The
evidence was all on paper, and should not have been submitted to
the jury.

There was no bank but the Mechanics' Bank which was expressly
exempt from taxation.

The Bank of Pennsylvania *did not apply for* an extension of
its charter at the session of 1829–30.   The Act of that year was
a *revenue measure*, and there is no evidence that the Bank of
Pennsylvania participated in it till the bill had passed both houses,
was approved, and was accepted by the stockholders.

But the material question is, whether the Bank is embraced by
the Act of 1848.   The Act is general in its terms, applying to all
banks, except to such as were expressly exempt from taxation.
In its case there was neither an express nor an implied exemption.
As to the argument that the premium of $5\frac{1}{2}$ per cent. to be paid
on the four millions, amounting to $220,000, was to be regarded
as a bonus paid for its charter, it will be seen that, according to

[Bank of Pennsylvania *v.* The Commonwealth.]

the practice of the Legislature about that time, this was a less price than was usually exacted from other banks at the time of granting or renewing their charters. But it is plain that there was neither an express nor implied exemption in the case of this Bank. The Act of 1830 imposed no tax on the dividends of *this* Bank; and the Act of 1835 imposed the graduated tax upon those banks only which were then subject to a tax on dividends, and it was by the indulgence of the Legislature, from 1835 till 1848, that this Bank was allowed to escape the tax imposed on nearly all of the banks of the state. The case of the Easton Bank, 10 *Barr* 442, rules the principle that arises here.

The power of taxation is essential to the existence of a state, and is an incident of sovereignty. In making a grant of land the right to tax it need not be expressly reserved: Prov. Bank *v.* Billings, 4 *Peters* 514. In the Act of 15th April 1835, rechartering the Mechanics' Bank of Philadelphia, it was declared that in consideration of the payment of $100,000, that Bank "shall be free from any tax or charge whatever, during the continuance of this charter." Here there was an express exemption.

In the Act of 4th May, 1852, relative to a loan for the completion of the North Branch Canal, it was provided that the loan "shall not be subject to taxation for any purpose whatever."

The case in 3 *Howard* 133, rightly understood, is an authority in favor of the power of a state to tax the dividends of banks. In that case it was decided that the stock of old banks was exempt from taxation, in consequence of a provision in the Act of 1821, exempting them from any further tax or burden; but the new banks, whose charters were extended without such stipulation, were declared liable to be taxed. The Court also defined the distinction between the franchise and the property of the Bank, and determined that, though after a charter has been granted the Legislature have no right to tax the franchise, they have the right to tax the property, and that the capital stock and dividends of a bank are to be regarded as *property*, and distinct from the franchise, or the right to carry on the business of banking.

The opinion of the Court, filed October 27, was delivered by

BLACK, C. J.—The Bank of Pennsylvania was first chartered in 1793. The charter was renewed in 1810, and afterwards again in 1830. By the last-mentioned act the Bank was incorporated for twenty-five years, with a capital of two and a half millions of dollars, and was required to loan to the Commonwealth a sum not exceeding four millions of dollars at a premium of five per cent., the certificates to bear an interest of five per cent. It was also enacted that all certificates of state stock should be issued and transferred at the Bank of Pennsylvania, without charge either to the Commonwealth or to the persons making such transfers.

[Bank of Pennsylvania v. The Commonwealth.]

These conditions of the charter were accepted and complied with. The state was the owner of three-fifths of the capital stock, and for that reason or some other this Bank was not made subject to the graduated tax upon dividends provided for by the act relating to banks, passed 1st April, 1835. But in 1843 the state sold out her shares of the stock, and in 1848 a law was passed extending the act of 1835 to all banks whose charters had been renewed or should afterwards be renewed, "*except in cases where there is an express exemption in the act extending or renewing their charters.*" The Auditor-General, deeming the Bank of Pennsylvania within the terms of this act, made out an account against it for taxes unpaid in 1848, 1849, and 1850, amounting, with interest, to $51,068.75. From this account the Bank appealed to the Common Pleas of Dauphin, whose judgment was in favor of the Commonwealth. The case comes to us on writ of error.

The charter contains no express stipulation on the part of the state not to tax the Bank or its stockholders, either for its property, its profits, its capital, or its franchises. It is therefore literally within the terms of the act of 1848. It can relieve itself from the payment of the tax only by showing the act which imposes it to be unconstitutional and void. This it asserts is the case, on the ground that the charter was a contract, and the act of 1848 a violation of it.

*That* an act of incorporation is a contract between the state and the stockholders, is held for settled law by the Federal Courts and by every State Court in the Union. All the cases on the subject are saturated with this doctrine. It is sustained not by a current, but by a torrent of authorities. No judge who has a ·
decent respect for the principle of *stare decisis*—that great principle which is the sheet anchor of our jurisprudence—can deny that it is immovably established. Sitting here to declare the law as it is, not as we would have it to be, our private opinions are not entitled to a feather's weight in opposition to the universal voice of our predecessors and our cotemporaries in every part of the country. I say this for myself alone. My brethren think the question does not arise here, and have given me no authority to commit them on it. But we are all willing, though for different reasons, to concede the correctness of the argument for the plaintiff in error, so far as it asserts that the charter is a contract. This being assumed, what is the true construction of it?

I have already said that there is no exemption from taxation stipulated for in the charter. The act of incorporation is entirely silent on that subject. We are then to consider whether the state lost the power to tax the dividends of the Bank by not reserving it in words, or whether the Bank, by not bargaining for exemption, left its stockholders liable to pay out of their profits a share of the

public expenses.    We think the latter proposition is true, and not the former.

The taxing power is an incident of the highest sovereignty.    It is an essential part of every independent government.    By the constitution, and by the principles which lie at the foundation of every organized society, the state may tax all the persons, natural and artificial, within her borders, and compel them to contribute such part of their property and income as the Legislature may think right, to defray the expenses and meet the engagements of the government.    The wealth of men who are associated together is not less subject to taxation than if it were owned by individuals. The right is as clear to tax an incorporated company as a mercantile partnership.    The state being in full possession of this power at the time of the contract in question, it is impossible to see how she could have lost it by not bargaining with the Bank for permission to keep it.

It is the appointed duty of the Legislature to use the power of taxing the people with justice and moderation, and not to alien it away.    To sell out this part of the state's sovereignty is not one of their regular functions.    It is intrusted to the legislative department not to be annihilated, but to be exercised and administered.    The power is given by all, and ought to operate on all for the benefit of all.    To exempt some would be to increase the burdens of others.    Taxation, to be just, must be equal, and to be equal, it must be universal.    The whole community has, therefore, a deep interest in retaining the power undiminished in the hands where the constitution has placed it.    Chief Justice MARSHALL (4 *Peters* 561) thought it so important that he seemed to doubt whether a state could relinquish it at all.    That it can be surrendered, at least partially, has since been settled in Gordon *v.* The Appeal Tax Court (3 *Howard* 146).    But surely, a power so vitally necessary to the very existence of a state, is not to be taken as surrendered, relinquished, and given up, by a contract which says nothing about it.

If acts of incorporation are to be so construed as to make them imply grants of privileges, immunities, and exemptions, which are not expressly given, every company of adventurers may carry what they wish without letting the Legislature know their designs. Charters would be framed in doubtful or ambiguous language, on purpose to deceive those who grant them; and laws which seem perfectly harmless on their face, and which plain men would suppose to mean no more than what they say, might be converted into engines of infinite mischief.    The Legislature, without knowing or intending it, might be thus induced to disarm the state of its most necessary powers, and transfer them to corporations.    The continued existence of a government under such circumstances would not be of much value.    There is no safety to the public

[Bank of Pennsylvania *v.* The Commonwealth.]

interests except in the rule which declares that the privileges not expressly granted in a charter are withheld.

Again : where is the end of a claim like this ? If the privilege of being exempt from taxes may be asserted by a bank because its charter does not say that it shall be taxed, what other privilege may it not claim on the same ground ? If silence is a gift of one privilege, why shall it not confer every other ? This rule of interpretation would make every act of incorporation a grant of unlimited power, except in so far as the power might be limited by express reservations in favor of the state.

Taking no other than the simplest commercial view of the transaction ; forgetting the injustice of freeing one portion of the people from the public burdens, and accumulating them all upon the rest ; considering the members of the Legislature as the mere factors of the state for the sale of immunities and privileges, and the Bank as a purchaser, the question still recurs, what and how much did it buy ? If the government is to be looked on as a dealer in commodities of this sort, the right conceded to other traders ought not to be denied her of retaining whatever she does not choose to part with. A man who has two acres of land and conveys one of them, does not thereby lose his title to the other. If I *sell* my horse, the purchaser does not by that means gain a right to my ox.

The interpretation which would make the silence of the charter imply a relinquishment of the taxing power, is against all analogy. Where land or other property is granted by the state, the grantee does not take it free from taxation. I do not know a single argument in favor of implying such an exemption from a bank charter which would not apply with quite as much force to a patent for land. If an act of incorporation is a contract, so is a patent. If the payment of a bonus for the charter implies that no more shall be paid, the same inference may be made from the payment of purchase-money of land. If a bank may be taxed so heavily as to take all its profits, the power, when exercised upon land, may be as much abused.

The powers exercised by Congress under the Constitution of the United States, are made up of those delegated to the federal government by the states. But the powers not delegated are reserved ; and though an amendment was added which declared this to be the construction, it was not doubted that it ought to be so interpreted, independent of any provision in the instrument itself. The amendment was opposed, on the sole ground that it was useless ; and its adoption only proves how jealous the people were of the rights of the states. It will take more than we have yet heard to convince us that the silence of the Constitution has withheld the sovereign powers of the state from the general government only to be absorbed by acts of incorporation, which are

[Bank of Pennsylvania *v*. The Commonwealth.]

equally silent. We are not satisfied that a bank charter, intended merely to make money for a few private individuals, should be more liberally construed than that great compact ordained by the people of the states for the most important of all earthly purposes, "to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty to themselves and their posterity."

The argument of the plaintiff in error is not only contrary to reason, against sound policy, inconsistent with the public safety, and opposed to plain analogy; but, what is perhaps more to the purpose, it is also in direct contradiction of the judicial authorities. It would be losing time to refer to cases abroad, when those decided in the Supreme Court of the United States (which, in cases like this, is the tribunal of the last resort) are conclusive, direct, and full to the point. The Providence Bank *v*. Billings (4 *Peters* 514), is so much like the case at bar, that no material difference is discernible. The Legislature of Rhode Island, in 1791, granted to the Providence Bank a charter, which, like that of the Bank of Pennsylvania, was silent on the subject of taxation. In 1822, a law was passed taxing its capital. The payment of the tax was resisted as a violation of the charter; but the Court were unanimously of the contrary opinion, and declared that an abandonment of the taxing power could never be presumed in any case where the deliberate purpose of the state to abandon it did not appear. "This power," said the Court, "resides in government as part of itself, and need not be reserved when property of any description or the right to use it in any manner is granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burdens, and that portion must be determined by the Legislature." In The Charles River Bridge *v*. The Warren Bridge (11 *Peters* 420), the same principle was reaffirmed in still stronger and broader terms. It was held in that case that no contract can be created between the state and a corporation by implication; and that all the privileges, exemptions, and immunities not granted in plain words, are reserved to the state. "Whenever," says Chief Justice TANEY, "any power of the state is said to be diminished, whether it be the taxing power or any other affecting the public interests, the same principle applies, and the rule of construction must be the same." These cases are in entire harmony with others in the same Court, (4 *Peters* 165; 3 *Peters* 289), and with the English cases decided before and since.

These decisions of the Supreme Court of the United States are binding on the State Courts, not merely as precedents, and therefore proving what the law is, but as the deliberate judgment of that tribunal with whom the final decision of all such questions

rests.   The State Courts have almost universally followed them. But no tribunal in the Union has acceded to the rule they lay down with a more earnest appreciation of its justice than did this Court in The Bank of Easton v. The Commonwealth (10 *Barr* 442). That was a much stronger case against the Commonwealth than the one now before us.   There the charter was *not* entirely silent on the subject of taxation.   The Bank was required to pay taxes at a fixed rate, and that rate was increased by subsequent legislation.   It was plausibly argued that the rate of taxation agreed upon in the charter implied a contract on the part of the state to claim nothing more.   But it was held otherwise, on the ground that if such an exemption existed, it must be the result of a deliberate intention to relinquish this prerogative of sovereignty distinctly manifested.   The Court declared that " to give the Act of incorporation such a construction would be a gross violation of the wholesome principle that an abandonment of the power of taxation is only to be established by clearly showing this to have been the deliberate purpose of the state."

If anything is settled, it is this rule of construction, that a corporation takes nothing by its charter except what is plainly, expressly, and unequivocally granted; and that in all things else the powers which the state may exercise over its affairs are as full and ample as if it were an individual carrying on the same business. When this principle comes to be applied to the case in hand, the argument of the plaintiff in error dissolves into nothing.

Two cases decided by State Courts have been cited, and apparently relied on with some confidence, in which it was held that certain banks were impliedly exempt from taxation, though there was no express stipulation to that effect.   One is The State of Ohio v. The Commercial Bank of Cincinnati (7 *Ohio Rep.* 125); the other is The Union Bank v. The State of Tennessee (7 *Yerger* 490). These cases resemble that of the Easton Bank more than the one before us.   In both, the grants were stronger than this; in both, the authorities were totally overlooked or disregarded; and in neither of them is the reasoning of the Court at all satisfactory.

The judge of the Common Pleas, among the reasons given for his opinion, said that this tax was imposed on the property of the stockholders, and not on the franchises of the Bank.   I do not see why this should have been excepted to, since we can only take notice of false conclusions, and not of bad reasoning.   But we have no doubt the judge was right.   The tax is not laid nor exacted until the dividends are declared, and then they are held by the Bank as a depository.   The Bank is liable to an action for refusing to pay them.   But it makes no difference whether they be called the franchise of the corporation or the property of the corporators; in either case they may be taxed.   In the Providence Bank case the capital was taxed.   Profits are quite as legitimate, and cer-

[Bank of Pennsylvania *v.* The Commonwealth.]

tainly a much fairer subject of taxation than capital without regard to its productiveness.

It was shown on the trial, that numerous other bank charters expressly reserved the right of taxation; from which the inference is attempted to be drawn, that without such a reservation the Legislature supposed the right would be gone. We can only say that if such was the opinion of the Legislature, it was a mistake; but it does not change the law. Probably, however, it was done, not in ignorance, but from a wise caution. It may have been prompted by a natural and prudent desire to take away from the banks all possible pretence for resisting the lawful authority of the Commonwealth.

The Court below charged the jury that the evidence of public embarrassment, the proclamation and message of the Governor, the journals of the House of Representatives, and the reports of its committees, should be wholly disregarded. What less could any Court be expected to do with such evidence? It was not only of no value, but it was delusive and dangerous. The impropriety of giving any attention to facts and circumstances outside of the record ought to be very easily seen. The act of incorporation, as it passed both Houses and was approved by the Governor, contained no exemption from taxes. In that shape the stockholders, at a meeting twelve days afterwards, accepted and agreed to it, and resolved that "the several provisions of the said act shall be binding on this corporation, according to the true intent and meaning thereof." With what show of propriety can they now go behind the charter and say that their assent was not given to "the several provisions of the said act," but to something else not contained in it?

If it were allowable to look beyond the written contract for evidence of its terms, if it were not the law that a previous oral agreement is merged in a subsequent written one, still the evidence here would amount to nothing, for none was given which showed that there ever existed anything like an understanding or agreement that the Bank should be exempt from taxation. If the Governor and every member of both Houses had been willing to insert such a stipulation in the act, it would not have been binding until it was actually inserted and accepted by the other party. But no willingness to do so was expressed by the Legislature. The Governor and Senate said nothing on the subject. The journals given in evidence are those of the House only. And what do they prove? Merely that a minority of that one House was in favor of providing for an annual tax instead of requiring a loan. But of course the majority had it their own way, carried the clause which made the loan a condition, and left the taxing power where it was before, without either surrendering it to the Bank or going through the useless formality of reserving it to the state.

Judgment affirmed.