[Civil No. 1272.   Filed July 15, 1912.]

[125 Pac. 884.]

STATE OF ARIZONA, on Relation of H. A. DAVIS, Appellant, v. SIDNEY P. OSBORNE, as Secretary of State, Appellee.

1. CONSTITUTIONAL LAW—STATUTES—VALIDITY—NATURE OF QUESTION.— The constitutionality of an act is strictly a judicial question, though it may involve the legality of holding an election and thereby have a political effect.

2. CONSTITUTIONAL LAW—STATE CONSTITUTIONS—NATURE.—A state constitution, unlike a federal constitution, which is a delegation of powers, is restrictive.

3. ELECTIONS—TIME FOR HOLDING.—An election cannot be held at a time not designated by law.

4. ELECTIONS—STATUTES—GENERAL ELECTIONS—CONSTITUTIONAL LAW. Act of June 14, 1912, providing for a general election in November, 1912, violates Constitution, article 7, section 11, which provides that the first general election in the new state shall be held in November of the first even-numbered year after the year in which Arizona is admitted to statehood; and, by providing for a canvassing board to consist of the Governor, Secretary of State, and Chief Justice of the supreme court, violates constitution, article 6, section

11, which makes the judges of the supreme court ineligible to any office not a judicial one, and constitution, article 5, section 11, which provides that the returns of the election for all state officers shall be canvassed and certificates of elections issued by the Secretary of State; and, by vesting original jurisdiction in the supreme court to hear and determine all election contests involving state officers, violates the provision of the constitution which limits that court's original jurisdiction to specified causes not including election contests, but the invalidity of the act as to state, county and precinct officers is separable from the provisions for the election of a representative in Congress and for presidential elections, which last-mentioned provisions are valid.

5. CONSTITUTIONAL LAW—CONSTRUCTION.—In construing a constitution it is presumed that each and every clause was inserted for some useful purpose, and hence the instrument must be construed as a whole, and the several provisions harmonized, if possible.

APPEAL from a judgment of the Superior Court of the County of Maricopa. J. C. Phillips, Judge.

Application by the State of Arizona, on relation of H. A. Davis, for injunction against Sidney P. Osborne, Secretary of State. Judgment for defendant, and plaintiff appeals. Reversed.

The facts are stated in the opinion.

Mr. W. L. Barnum for Appellant.

Mr. Lewis T. Carpenter, Assistant Attorney General, for Appellee.

PER CURIAM.—In this action the question is submitted to the court whether an act of the legislature approved June 14, 1912, entitled "An act providing for general elections of representatives in Congress, of state, county, and precinct officers, and of presidential electors in the state of Arizona; providing for the method of canvassing the vote at said elections; prescribing the method of contesting said elections; and fixing the time at which said elections shall be held"—is repugnant to the constitution of the state of Arizona, and whether such election may be legally held on the first Tuesday after the first Monday in November, 1912, for the purposes designated in the act. In form the proceeding is an applica-

tion for a writ of injunction to Sidney P. Osborne, Secretary of State, restraining him from transmitting notices in writing to the boards of supervisors of the several counties of the state under an act of the state legislature providing for a primary election for the nomination of candidates for elective public offices. The action was begun in the superior court of Maricopa county, a temporary injunction was issued, and on the final hearing the injunction was dissolved. The matter involving a question *publici juris* of importance and general interest to the people of the state, it was brought before this court on appeal by an agreed case. It is conceded that the Secretary of State is proceeding to issue a call for a primary election for the nomination of candidates for elective public offices, including all state, county, and precinct offices, and if the act of the legislature, fixing the first Tuesday after the first Monday in November, 1912, for a general election for state, county, and precinct offices, is void as being repugnant to the state constitution, the action of the Secretary of State in the premises is illegal, and the judgment of the superior court should be reversed and the temporary injunction heretofore issued should be made permanent by order of this court.

It will be seen that the matter presented calls upon this court to perform its gravest function, that of looking at the language of an act written by delegated authority in the light of language written by the sovereign itself, and declaring which language shall speak authority, that of the representatives of the people, or that of the people themselves. It is a duty that this court will not shirk or evade. Its judges are sworn to support the constitution of the state of Arizona and faithfully and impartially discharge the duties of judge to the best of their ability. This duty we shall perform at all times while we have the honor to sit on the bench, against all encroachments from any source, but in a manner, we trust, befitting the highest tribunal of the state. It may be urged through sinister design or from selfish motives that this court should refuse to pass upon the matter presented for the reason that it is political and not a judicial question. We feel persuaded that no lawyer of standing at the bar would so assert on giving the matter consideration.

· The superior courts have jurisdiction in all causes and of all proceedings in which jurisdiction shall not have been

vested exclusively in some other court. The supreme court has appellate jurisdiction in all actions and proceedings except a civil action to recover money or property where the original amount in controversy does not exceed the sum of $200. Our courts are not divided into courts of equity and courts of common-law jurisdiction, as is the case in those jurisdictions whose authorities, if superficially considered, would lend color to the view that courts will not decide questions of a political nature. The jurisdiction in law and in equity under our scheme of government is blended in one court which may give appropriate judgment in all cases according to the law and the facts as they may arise.

The superior courts of the state are not limited to the ordinary injunction in equity, the scope and purpose of which is limited to matters involving property or civil rights; but the prerogative writ of injunction may be resorted to in all cases necessary to preserve the sovereignty of the state, its prerogatives and franchises. This matter is reviewed, and the distinction made is very clearly pointed out in Case Note, 3 L. R. A., N. S., 382. Matters pertaining to the election of public officers are the very highest prerogatives of the state, and no officer of the state may proceed in such matter without authority of law for his action.

The constitutionality of an act of the legislature, although it may determine the legality of holding an election and thereby have a political effect, is strictly a judicial question. For whether the act is within the limits of its delegated power or not is a strictly judicial question to be decided by the courts, and in no sense political. This principle is deducible from the authorities, and the doctrine was forcibly announced by the supreme court of the United States, speaking through Chief Justice Fuller, in the case of *McPherson* v. *Blacker,* 146 U. S. 1, 36 L. Ed. 869, 13 Sup. Ct. Rep. 3. Chief Justice Fuller said: "It is argued that the subject matter of the controversy is not of judical cognizance, because it is said that all questions connected with the election of a presidential elector are political in their nature; that the court has no power finally to dispose of them; and that its decision would be subject to review by political officers and agencies, as the state board of canvassers, the legislature in joint convention, and the governor, or, finally, the Congress. . . . The question

of the validity of this act, as presented to us by this record, is a judicial question, and we cannot decline the exercise of our jurisdiction upon the inadmissible suggestion that action might be taken by political agencies in disregard of the judgment of the highest tribunal of the state as revised by our own."

In *State* v. *Cunningham,* 81 Wis. 440, 505, 15 L. R. A. 561, 51 N. W. 724, it is said: "The truth is that the power of the respondent to notify elections is in no just sense whatever political; and, in view of the purely ministerial nature of his duty, it is a misuse of terms to assert that his power or duty is in any sense political. The act he is required, as a ministerial officer, to assist in executing by giving notice is the *result* of legislative power, and therefore, it may be said, of *political* power; but this does not make the act required of the respondent, in giving or refusing to give the notices, which is a mere consequence of the exercise of political power, a *political* act, so as to prevent judicial examination of his conduct in acting or refusing to act for that reason, if the law is void for conflict with the constitution. Were the case otherwise, no act of the legislature could be questioned for conflict with the constitution, because it could be said in any such case, as appropriately as in this, that the enactment of the law itself was an exercise of political power, and the court could not, therefore, examine it to determine whether it is in conformity with the constitution. Such a contention confounds all distinction between the law itself and mere ministerial acts done or required to be done under it." This case was followed and approved in *State* v. *Cunningham,* 83 Wis. 90, 35 Am. St. Rep. 27, 17 L. R. A. 145, 53 N. W. 35.

The duty thus devolved cannot be avoided, however unpleasant it may be. In the language of Chief Justice Marshall, "Those who fill the judicial department have no discretion in selecting the subjects to be brought before them." *Worcester* v. *Georgia,* 6 Pet. 541, 8 L. Ed. 483. And again the great Chief Justice spoke in *Osborn* v. *Bank of United States,* 9 Wheat. 866, 6 L. Ed. 204: "Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are mere instruments of the law and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course

prescribed by law; and, when that is discerned, it is the duty
of the court to follow it. Judicial power is never exercised
for the purpose of giving effect to the will of the judge;
always for the purpose of giving effect to the will of the legis-
lature; or, *in other words, to the will of the law.*"

The will of the law in the present case is the will of the
people written into the fundamental law. Chief Justice
Taney, in his last judicial utterance, said: "Any legislation
by Congress beyond the limits of the power delegated would
be trespassing upon the rights of the states *or the people,* and
would not be the supreme law of the land, but null and void,
and it would be the duty of the courts to declare it so. For
whether an act of Congress is within the limits of its dele-
gated power or not is a *judicial question* to be decided by the
courts." *Gordon* v. *United States,* 117 U. S. 705.

The three co-ordinate departments of the government—the
legislative, executive, and judicial—must each move within
its sphere; each must remain separate and distinct; it is so
provided by our organic law. Each must act within the scope
of the power given it by the sovereign will of the people ex-
pressed in their constitution; thus will difficulties be evaded
and perplexities avoided.

In passing upon the question we disclaim any purpose or
right to interfere with the discretionary powers of the legis-
lature, or of any state officer. In giving judgment in this
cause the court is merely acting as a mediator between the
asserted power of the people in the constitution they have
adopted, and an asserted power of the legislature as delegated
representatives of the people. This is its constitutional func-
tion.

Mr. Justice Orton, speaking for the whole court, in the case
of *State ex rel. Attorney General* v. *Cunningham,* 81 Wis. 484,
15 L. R. A. 561, 51 N. W. 730, said: "But it is sufficient that
the questions are judicial and not legislative. The legislature
that passed the act is not assailed by this proceeding, nor is
the constitutional province of that equal and co-ordinate
department of the government invaded. The law itself is the
only object of judicial inquiry, and its constitutionality is
the only question to be decided."

When we have determined that an act of the legislature is
constitutional and therefore the law, or that the act is uncon-

stitutional and therefore not the law, it then becomes the constitutional duty of the courts, in appropriate cases, involving the performance of ministerial duties, to compel legal action on the part of the officers and agents of the government when they refuse to act, as on the other hand to restrain illegal action when they proceed to act.

The legislature are but representatives delegated to perform duties in subordination to the will of the people. The legislature speak for the people. The sovereign people speak in the language of their constitution. Their will expressed in the constitution is the will of the sovereign itself. The legislature may speak but only within the limitations of the fundamental law. The courts may interpret and administer the law, but only in keeping with the oath of the judges to support the constitution. The executive may execute the law, but under the guise of its execution may not lay a hand against the sovereign will.

Section 11 of article 7 of the constitution provides: "There shall be a general election of representatives in Congress, and of state, county, and precinct officers on the first Tuesday after the first Monday in November of the first even-numbered year after the year in which Arizona is admitted to Statehood, and biennially thereafter."

The provisions of the constitution must be a limitation upon the legislative power, else they would not have been placed in the organic law. A state constitution, unlike the federal constitution, which is a delegation of powers, is restrictive. If the constitution had remained silent as to the time for election of state, county, and precinct officers, and the tenure of office was not otherwise fixed in the instrument, it could not be questioned that the power of the legislature, with regard to fixing the time for such election, would have been absolute. But the constitution fixing the time for such election, an act of the legislature fixing a different date is so far repugnant thereto and to that extent the legislative act must fail. The constitution in conferring on the legislature authority has prescribed to its exercise any limitations which the people saw fit to impose, and no other power than the people can superadd other limitations; neither can any other power than the people strike from the fundamental law any limitations which the people have prescribed therein.

It is fundamental that an election cannot be held at a time not designated by law; that a volunteer election is no election. It would be useless to cite authorities to sustain such an elementary proposition. The time for having an election to select officers to administer the respective departments of the government is a high prerogative of the people of a state. That time may be fixed by the people in the sovereign capacity of adopting their constitution, or it may be left to the delegated representatives of the people in the legislature; but, if fixed by the people, the people alone can change it. The legislature cannot do it, and the courts cannot. As was said in a recent Colorado case, if the courts can amend the constitution to-day, and insert therein something that was never there, to sustain a law, they have equal authority to amend the constitution to-morrow and strike therefrom something previously there to overthrow a law. The sovereign people, in whom is vested all governmental power, have spoken in their organic law, and their mandate, so expressed, must be enforced by the courts, even though wise and beneficial attempted legislation is thereby defeated. *People* v. *Leddy,* 53 Colo. 109, 123 Pac. 824.

The peculiar value of a written constitution is that it places, in unchanging form, limitations upon legislative action, unless amended by the people in the mode they have designated, thus giving a permanence and stability to popular government which otherwise would be lacking.

We adopt as our own the language of one of the soundest and most thorough thinkers and jurists who have written on the subject of organic law embodied in our constitutions: "The courts tread upon dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the things to be done; and they must then be regarded in the light of limitation upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and to fix those unvarying rules, by which all the departments of government must at all times shape their conduct. . . . We are not, therefore, to expect to find in a constitution provisions

which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in our instrument, which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only. And we impute to the people a want of due appreciation of the purpose and proper province of such an instrument when we infer that such directions are given to any other end." Cooley's Constitutional Limitations, 7th ed., p. 114.

As was said in *Perry County* v. *Selma etc. R. R. Co.*, 58 Ala. 556: "We think the only safe rule for interpreting clauses of the constitution which command certain things to be done, or certain methods to be observed in the enactment of statutes, is to hold that, when it is affirmatively shown by legal evidence that in the attempt to legislate some mandate of the constitution has been disregarded, such attempt never becomes a law." *Coleman* v. *Eutaw*, 157 Ala. 327, 47 South. 703; *Opinion of Justices Supreme Court*, 18 Me. 464; *State* v. *Johnson*, 26 Ark. 281, 287; *Varney* v. *Justice*, 86 Ky. 596, 6 S. W. 457; *McPherson* v. *Blacker, supra.*

A constitution framed by a convention after the most solemn and deliberate consideration, and ratified and adopted by the people as their fundamental law to guide and limit the functions of their public servants, and this after a long campaign in which every officer elected spoke and pledged fidelity to it in spirit and in letter, cannot be viewed in the same light as an act of the legislature passed by the delegated representatives of the people, and which act of the legislature is necessarily of a temporary nature.

Coming to the act in question, it appears to be repugnant to the constitution in many aspects. It provides for the election of a representative in Congress and for all state, county, and precinct officers on the first Tuesday after the first Monday in November in the year 1912, and every two years thereafter. Also for choosing presidential electors. It provides for a canvassing board to consist of the Governor, Secretary

XIV Ariz.—13

of State, and Chief Justice of the supreme court. This provision is repugnant to the constitution in two particulars. Members of a canvassing board, while performing a high public function, act strictly in a ministerial capacity. It is a public office of employment, but in no wise judicial. Section 11, article 6 of the constitution provides that "judges of the supreme court and judges of the superior courts shall not be eligible to any office or public employment other than a judicial office or employment, during the term for which they shall have been elected." And again the duty of canvassing the returns of the election for all state officers devolves upon the Secretary of State, and no other officer can perform such duties. By section 11 of article 5 of the constitution, it is provided: "The returns of the election for all state officers shall be canvassed, and certificates of election issued by the Secretary of State, in such manner as may be provided by law." This section of the constitution is, however, not self-executing. It requires that the Secretary of State shall perform such duties in such manner as may be provided by law. Clearly it was the duty of the legislature to provide the manner in which the secretary should canvass the votes.

The act in question vests original jurisdiction in the supreme court to hear and determine all election contests involving state officers. Under our constitution, the supreme court is essentially a court of appellate jurisdiction. It is the scheme of our government that contested matters involving questions of fact may take place in an inferior tribunal, and the matter, after judgment, may be reviewed independently in this court on appeal or writ of error. In view of this, the constitution has wisely limited the original jurisdiction of the supreme court to *habeas corpus*, and *quo warranto* and *mandamus* as to all state officers, and original and exclusive jurisdiction in causes between counties concerning disputed boundaries and surveys thereof, and concerning claims of one county against another. It is not to be supposed that the legislature may vest us with a jurisdiction which the constitution denies, and take away a jurisdiction from the superior courts which the constitution vests in those tribunals.

Section 1 of article 5 of the constitution prescribes of what the Executive Department shall consist, designates the officers,

and fixes the terms of those elected under the enabling act approved June 20, 1910. The term shall begin when the state is admitted into the Union and shall end on the first Monday in January, A. D. 1913, or when their successors are elected and qualify.

It is a matter of history that the state was admitted into the Union on the fourteenth day of February, 1912. The section is plain and unambiguous. They are elected at the election provided by the enabling act, and the terms of the governor and other designated officers comprising the Executive Department of the state began on February 14, 1912, and end when their successors are elected and qualify.

Section 3, article 6: "Judges of the Supreme Court shall be elected at the general election to be held under the provisions of the Enabling Act approved June 20, 1910. Their term of office shall be coterminous with that of the governor of the state elected at the same time, and the one receiving the highest number of votes shall be the chief justice. At the first general state election thereafter, held under this constitution, at which a governor is voted for, three judges of the supreme court shall be elected, and the judges elected thereat shall be classified by lot, so that one shall hold office for a term of six years, one for a term of four years, and one for a term of two years, from and after the first Monday in January next succeeding said election. The lot shall be drawn by the judges-elect, who shall assemble for that purpose at the state capitol, and shall cause the results to be certified to the Secretary of State, who shall file the same in his office. The judge having the shortest time to serve, and not holding his office by appointment or by election to fill a vacancy, shall be the chief justice, and shall preside at all sessions of the supreme court. In case of absence of the chief justice, the judge having in like manner the shortest time to serve shall preside. After the first state election one judge shall be elected every two years at the general election, and the term of the judge elected shall be six years from and after the first Monday in January next succeeding his election, and judges so elected shall hold office until their successors are elected and qualify."

Again it is observed that the first judges of the supreme court are elected at the general election held under the provisions of the enabling act. The one receiving the highest

vote is the chief justice. Their term of office is coterminous
with that of the governor elected at the same time; that is,
the terms shall end on the first Monday in January, A. D.
1913, or when their successors are elected and qualify.

Then it is provided in said section that: ''At the first gen-
eral state election thereafter, held under this constitution, at
which a governor is voted for, three judges of the supreme
court shall be elected, and the judges elected thereat shall be
classified by lot, so that one will hold office for a term of six
years, one for a term of four years, and one for a term of two
years, from and after the first Monday in January next suc-
ceeding said election. The lot shall be drawn by the judges-
elect, who shall assemble for that purpose at the state capitol,
and `shall cause the results to be certified to the Secretary of
State, who shall file the same in his office. The judge having
the shortest time to serve, and not holding his office by ap-
pointment or election to fill a vacancy, shall be the chief jus-
tice, and shall preside at all sessions of the supreme court. In
case of absence of the chief justice, the judge having in like
manner the shortest time to serve shall preside. After the
first state election one judge shall be elected every two years
at the general election, and the term of the judge elected shall
be six years from and after the first Monday in January next
succeeding his election, and judges so elected shall hold office
until their successors are elected and qualify.''

It will readily be seen that no election for judges of the
supreme court is contemplated or permitted before the general
election provided for by the constitution. For at the first
general election held under the constitution, at which a gov-
ernor is voted for, one of the judges is elected for six years,
one for four years, and one for two years, to be determined
by lot; the one receiving the shortest term to be chief justice.
At any election held before this there is no provision for a
chief justice; indeed, if such election could be held, there
would be no chief justice to preside. After the first state
election, one judge of the supreme court is elected biennially
or every two years. So it must be conceded that at the first
general state election after the election under the provisions
of the enabling act, one of the judges of the supreme court
must be elected for six years, one for four years, and one for
two years. And it is but a short arithmetical problem to

demonstrate that an officer cannot be elected in 1912 for a term of six years, and his successor be elected in 1914 for a term of six years. But it was intimated on argument, though without insistence or persuasion, that the election provided for by the act of the legislature is not an election held under the constitution. Such an argument, if indulged in, would be *reductio ad absurdum.*

Is it possible that the departments of the state government are not at present subordinate to the provisions of the constitution? Is it to be thought of that the legislature in the discharge of their duties did not have the constitution as a golden mete wand to guide and limit their efforts? Would it be contended that the highest tribunal of the state, when it sits in deliberation to pass solemn judgment upon the lives and property rights of the people of this great state, is not to be controlled and circumscribed in its proceedings by the instrument that gave it birth? The language, "to be held under this constitution," plainly as words can express the idea is to be held after the constitution takes effect. It would, indeed, be a matter of concern to the people of this great state if their judicial servants were so bold as to announce that the constitution, which the people labored for and brought into life after much time and effort, is not at present the polar star of our government, but lies in desuetude until resurrected by a general election to be held in 1914.

At the first general election thereafter, held under this constitution, etc., is the language of the constitution, and it is clear that section 11 of article 7 provides such election.

The matter is again emphasized by section 5 of article 6 of the constitution: "The first judges of the superior court shall be elected at the general election to be held under the provisions of the enabling act approved June 20, 1910. Their term of office shall be coterminous with that of the governor of the state elected at the same time. Thereafter the term of office of all judges of the superior court shall be four years, from and after the first Monday in January next succeeding their election and until their successors are elected and qualify. All judges of the superior court shall be elected at the general state election by the qualified electors of their respective counties."

Again, the first judges of the superior courts are elected under the provisions of the enabling act. Again, their term of office is coterminous with that of the governor. But it will be observed that it does not in words provide that the terms of the judges of the superior court extend to any particular date, or when their successors are elected and qualify. After referring to the election under the enabling act, the section reads: "Thereafter the term of office of all judges of the superior court shall be four years, from and after the first Monday in January next succeeding their election and until their successors are elected and qualify." This section in unequivocal terms fixes the term of office of the judges of the superior courts to be four years, except the term of office fixed by virtue of the first election, to wit, the election under the enabling act, and then, again, emphasizes the matter by saying: "All judges of the superior court shall be elected at the general state election by the qualified electors of their respective counties."

In this section, unlike the section with reference to the election of judges of the supreme court, where the first general state election is named, the word "first" is not inserted before "general election." Plainly the election attempted to be provided for by the act of the legislature is a general state election, yet it will readily be seen that if the term of office of judges of the superior court resulting from the first election under the enabling act is to be coterminous with that of the governor elected at the same time, and such judges cannot be elected in 1912, their term of office cannot be coterminous with that of the governor. On the other hand, it would be as absurd to contend that the judges of the superior court are to be elected in 1912 for a term of four years and again elected in 1914 for a term of four years. It cannot be seriously questioned that state, county, and precinct officers must stand for election in 1914.

Section 1 of article 15 of the constitution provides: "A corporation commission is hereby created to be composed of three persons, who shall be elected at the general election to be held under the provisions of the enabling act approved June 20, 1910, and whose term of office shall be coterminous with that of the governor of the state elected at the same time, and who shall maintain their chief office, and reside, at

the State Capital. At the first general state election held under this constitution at which a governor is voted for, three commissioners shall be elected who shall, from and after the first Monday in January next succeeding said election, hold office as follows: The one receiving the highest number of votes shall serve six years, and the one receiving the second highest number of votes shall serve four years, and the one receiving the third highest number of votes shall serve two years. And one commissioner shall be elected every two years thereafter.''

They are elected at the general election held under the enabling act; their term of office being coterminous with that of the governor elected at the same time. Then the corporation commissioners are to be elected when? The constitution says, at the first general state election held under the constitution at which a governor is to be voted for, and their term of office is fixed at six, four, and two years, respectively.

The phraseology with reference to the election of judges of the supreme court is, ''at the first general state election *thereafter,* held under this constitution,'' referring to the election under the enabling act. Concerning corporation commissioners, ''at the first general state election held under this constitution.'' The word ''thereafter'' is omitted, but it necessarily means the same thing, for the first general state election held under the constitution must necessarily be ''thereafter,'' or, in other words, after the election under the provisions of the enabling act.

Section 3, article 12: ''Subject to change by law, there are hereby created in and for each organized county of the state the following officers who shall be elected by the qualified electors thereof: Sheriff, recorder, treasurer, school superintendent, county attorney, assessor, county superintendent of roads, and of surveyor, each of whom shall be elected for a term of two years, except that such officers elected at the first election for state and county officers shall serve until the first Monday in January, 1913; and three supervisors, whose term of office shall be provided by law, except that at the first election of county officers the candidates for supervisor receiving the highest number of votes shall hold office until the first Monday in January, 1915, and the two candidates for supervisors, respectively, receiving the next highest number of votes shall hold office until the first Monday in January, 1913.''

Section 21, article 4: "The members of the first legislature shall hold office until the first Monday in January, 1913. The terms of office of the members of succeeding legislatures shall be two years."

Section 6, article 22: "All territorial, district, county, and precinct officers who may be in office at the time of the admission of the state into the Union shall hold their respective offices until their successors shall have qualified, and the official bonds of all such officers shall continue in full force and effect while such officers remain in office."

It was argued by the attorney general in his oral argument before the court that the provisions of the constitution, with reference to the tenure of office, wherein it is provided that the officers shall hold office until the first Monday of January, 1913, are mandatory, and that unless an election is had in November, 1912, the offices will become vacant. One answer to this is that the constitution itself provides against such a contingency wherein it says: "The term of office of every officer to be elected or appointed under this constitution or the laws of Arizona shall extend until his successor shall be elected and shall qualify." Sec. 13, art. 22.

But it may be contended that section 13, article 22, has no application to officers elected on December 12, 1911, and whether it does or not depends as to whether such officers were elected under the constitution and laws of Arizona.

The enabling act provided that the constitutional convention should by ordinance provide for the election of officers for a full state government in case Arizona was admitted to statehood: Sec. 23, Enabling Act, June 20, 1910. The constitutional convention, accordingly, ordained "a proposition relative to the ordinance to provide for the election of the first officers for a full state government," entitled Election Ordinance No. 2. This ordinance prescribed that the qualifications of electors should be as provided by title 22, Revised Statutes of Arizona of August 2, 1901. That the ballots should be prepared, printed, furnished and distributed as required by the election laws of the territory of Arizona for elections therein. The candidates for election should be nominated in accordance with chapter 24, Session Laws of Arizona of 1909. It further provided that "the election laws of the territory now in force, as far as applicable and not in con-

flict with the enabling act, including the penal laws of said territory relating to elections and primaries and illegal voting and other illegal practices thereat are extended to the primary and election herein provided for.'' It will thus be seen that the election held on December 12, 1911, was conducted under the laws of Arizona, and that the officers were elected under those laws. This is apparent when it is taken into consideration that throughout the constitution the words ''state'' and ''state of Arizona'' are employed, and that in no other place in the constitution are the words ''laws of Arizona'' used. The evident purpose of the use of the expression ''laws of Arizona'' in this section was to comprehend every officer elected or to be elected either under the laws of the state of Arizona or the laws of the territory of Arizona.

Where in a statute or the constitution the tenure of office is fixed, the courts have many times held that no vacancy occurs, if the laws or constitution provide for their holding over until their successors are elected and qualified.

In the case of *Badger et al.* v. *United States,* 93 U. S. 599, reading pages 601 and 602 (23 L. Ed. 991), it is said: ''By the common law, as well as by the statutes of the United States, and the laws of most of the states, when the term of office to which one is elected or appointed expires, his power to perform its duties ceases. *People* v. *Tilman,* 8 Abb. Pr. (N. Y.) 359, 30 Barb. (N. Y.) 193. This is the general rule. . . . The system of the state of Illinois seems to be organized upon a different principle. Thus, the supreme court consists of seven judges, who are required to possess certain qualifications of age and of residence, and who are elected for the term of nine years (Code (Rev. Stats.) of Illinois 1874, pp. 69, 70), at which time it is provided that the 'term of office shall expire.' Circuit judges in like manner are elected for a term of six years: Id., p. 70. County judges and county clerks, probate judges and state's attorneys, are elected for the term of four years: Id., pp. 71, 72. As to all of these officers, including judges, it is provided in the constitution of Illinois that 'they shall hold their offices until their successors shall be qualified': Id., p. 73, sec. 32. They may thus hold their offices much longer than the terms for which they are elected.''

In the case of *Commonwealth* v. *Hanley,* 9 Pa. 513, the court held, under a constitutional provision, that ''they shall

hold their offices for three years . . . and until their successors shall be duly qualified''; that there was no vacancy in the office. To the same effect are the following cases: *State* v. *Tallman,* 24 Wash. 426, 64 Pac. 759; *Gosman* v. *State,* 106 Ind. 203, 6 N. E. 349; *State* v. *Harrison,* 113 Ind. 434, 3 Am. St. Rep. 663, 16 N. E. 384; *State* v. *Howe,* 25 Ohio St. 588, 18 Am. Rep. 321; *State* v. *Lusk,* 18 Mo. 334; *People* v. *Lord,* 9 Mich. 226; *People* v. *Tilton,* 37 Cal. 614; *People* v. *Edwards,* 93 Cal. 153, 28 Pac. 831; *People* v. *Hardy,* 8 Utah, 68, 29 Pac. 1118; *Eddy* v. *Kincaid,* 28 Or. 537, 41 Pac. 156, 655; *State* v. *Compson,* 34 Or. 25, 54 Pac. 349; *Smith* v. *Holt,* 24 Kan. 771; *Badger* v. *United States,* 93 U. S. 599, 23 L. Ed. 991; 23 Cyc. 515; 29 Cyc. 1397.

Precinct officers are in the same situation as all the other officers created by the constitution. They were in office on the date of the admission of the state into the Union and by virtue of section 6, article 22, they continue in office until their successors have qualified. No election for such officers was had in December, 1911, for the reason that the enabling act and Ordinance No. 2 failed to provide for the election of precinct officers. The constitution having made no provision for the election of such officers until the first general state election, precinct officers will hold until their successors are elected at that time and qualify.

The constitutional convention finished its work of writing the constitution on December 9, 1910. This instrument under the enabling act was to be submitted to the people for ratification in not less than sixty days nor later than ninety days after the adjournment of the convention that framed it. The returns were to be canvassed on the third Monday after the election. It was provided by the enabling act that, if the constitution should be rejected, the governor should reconvene the constitutional convention, which should frame a new constitution, subject to the same proceedings of ratification as if originally prepared. When the constitution was finally ratified, it was to be sent to the President and Congress for their approval, and, if approved, the President was to certify the facts to the governor within thirty days. An election of officers was then to be had not earlier than sixty days nor later than ninety days after a proclamation of the governor to that effect. It will be seen by a survey of these facts that

the members of the constitutional convention could not, with any definiteness, foretell when Arizona would be admitted to statehood. It was possible, if the President and Congress would approve the constitution at the earliest date after receiving it, that statehood would be accomplished by June, 1911, in which event the first general state election would, as provided in the constitution, fall on the first Tuesday after the first Monday in November, 1912. The facts are that the President and Congress failed to approve the first draft of our constitution, and, by a joint resolution of Congress, the people were required to eliminate some feature objectionable to the President. This required another submission and ratification. December 12, 1911, the people voted on the amended constitution and at the same time elected their officers. The returns of this election were sent to the President, who, on February 14, 1912, issued his proclamation admitting Arizona to statehood.

All of the difficulties encountered by official delays at home, by refusal of the President and Congress to approve the constitution, legislation requiring the people to amend their fundamental law, could not be known in advance, but some of them could reasonably be, and probably were, apprehended by the framers of the constitution.

By reason of the uncertainty as to when admission would be had, the convention very thoughtfully provided by section 11, article 7, that "there shall be a general election of representatives in Congress, and of state, county, and precinct officers on the first Tuesday after the first Monday in November of the first even numbered year after the year in which Arizona is admitted to statehood, and biennially thereafter." In other words, the constitution provides that if admission to statehood was had in 1911, a general election of such officers should be held in 1912, and if admission is had in 1912 or 1913, an election of such officers is to be had in 1914. Admission being accomplished in 1912, the first even-numbered year thereafter is 1914. Hence no general election of those officers may be had until 1914.

Here the constitution has fixed the time for holding the first general state election by saying that it shall be "on the first Tuesday after the first Monday in November of the first even-numbered year after the year in which Arizona is ad-

mitted to statehood and biennially thereafter,'' which, under the facts in this case, as clearly and definitely names 1914 as if it had been written outright into the constitution.

It should be borne in mind that the provisions of the constitution creating offices and fixing their tenure in no way bear upon the question of elections. They do not attempt or pretend to say when successors shall be chosen. They create and fix the tenure of offices. Under a different subject matter—''Suffrage and Elections''—the constitution fixes the date of holding elections. This is the only date fixed or attempted to be fixed. It is as certain as to time as the English language can make it. Had the constitution contemplated an election for state, county, and precinct officers at any other times than named specifically in the instrument, before fixing the date thereof its framers would have used the words ''unless otherwise provided by law'' there shall be a general election, etc. The absence of any such expression is very significant. We are not to impute the absence of such words, or those of like import, to any other significance than a clear intent to definitely fix the time.

By section 32, article 2, of the constitution, its provisions are mandatory unless by *express words* they are declared to be otherwise. ''Mandatory'' is defined as a command, hence obligatory. That which we must implicitly follow and obey.

It is a salutary rule of construction that the presumption and legal intendment is that each and every clause in a written constitution has been inserted for some useful purpose, and therefore the instrument must be construed as a whole in order that its intent and general purpose may be ascertained; and, as a necessary result of this rule, it follows that, whenever it is possible to do so, each provision must be construed so that it shall harmonize with all others without distorting the meaning of any of such provisions, so that the intent of the framers may be ascertained and carried out and effect given to the instrument as a whole. 8 Cyc. 730.

For the purpose of harmonizing apparently conflicting clauses in a constitution, each must be read with direct reference to every other which relates to the same subject, if possible, so as to avoid repugnancy.

If we were to read the several provisions of the constitution with reference to the election of officers under the provisions

of the enabling act, and their terms of office as stated, and the provisions for the re-election of such officers at the first general state election thereafter held under the constitution, and then read, with direct reference to such provisions, section 11 of article 7: "There shall be a general election of Representatives in Congress, and of state, county, and precinct officers on the first Tuesday after the first Monday in November of the first even numbered year after the year in which Arizona is admitted to statehood, and biennially thereafter"— there is perfect harmony and no ambiguity or repugnancy whatever. The meaning comes upon us just as St. Paul says, "The sparks fly upward—naturally." We plainly see that the framers of the fundamental law had in mind but two elections, one under the provisions of the enabling act, at which all the officers elected had but one coterminous tenure of office. All were elected to remain in office for the same length of time. The other, the general election to be held thereafter, under the constitution, at which the officers to be elected have varying terms of office. Clearly, we could give no other construction, unless it be a strained and confused one and make discord where harmony prevails. Such construction bears out the intent and general purpose of the constitution and ought to prevail.

And then as Mr. Cooley, one of the soundest jurists who have written on the subject of Constitutional Limitations, says: If directions are given respecting the times or modes of proceeding in which a power should be exercised, the presumption is that the people designed that it should be exercised in that time and mode only, and we would impute to the people a want of due appreciation of the purpose and proper province of such an instrument when we infer that such directions are given to any other end.

The constitution of Arizona was adopted by the convention on December 9, 1910, and, at an election provided therefor, was, on the ninth day of February, 1911, overwhelmingly ratified by the votes of the people. After a resolution of Congress approving the constitution as adopted by the people, President Taft owing to his hostility to the recall of the judiciary, placed his disapproval upon it by the veto, thereby greatly disappointing the people of this state. After unaccountable delays from many sources, the constitution was

again submitted to the people on December 12, 1911, at which time officers for a full state government were elected. Knowing that it was the only method of obtaining their political independence, the people, in order to establish their own government, obeyed the command of the President and rejected the recall of judges from the constitution. And finally, after all the delays and trials and misgivings that attended it, the gladsome tidings were flashed over the wires, on February 14, 1912, to an exultant people, that the proclamation admitting Arizona to statehood had been signed by the President, and the patient work and hope of years was at last realized.

The constitution provides, in article 7, section 11: "There shall be a general election of representatives in Congress, and of state, county, and precinct officers on the first Tuesday after the first Monday in November of the first even numbered year after the year in which Arizona is admitted to statehood, and biennially thereafter."

We hold that such provision is mandatory, and any act of the legislature attempting to fix another and a different time for holding a general election of state, county, and precinct officers is, with respect to the time fixed, in conflict with the constitution of this state and must necessarily give way. The sovereign voice is mandatory. It has fixed the time. No other power than that of the sovereign who fixed it can make a change. It is certainly not allowable for this court to set aside the obligation of such constitutional provision as directory merely. The constitution says that the general election for such officers shall be held on the first Tuesday after the first Monday in November, 1914, and biennially thereafter, and, because it does not in words prohibit holding a general election therefor annually, no reasonable man would for a moment contend that, by reason of no express prohibition being incorporated therein, the legislature may provide for general elections annually, or semi-annually, or even monthly, after the first general election provided for by the constitution, or as many general elections for such purpose before that time as the legislature may see fit to prescribe. The word "thereafter" cannot be construed to mean "before."

As we have seen, the act is repugnant to the constitution in many particulars. It conflicts as to the date for holding the first general election for state, county, and precinct offi-

cers. It conflicts as to who shall canvass the returns and issue certificates of election. It conflicts as to the court which shall have original jurisdiction in election contests. Such an act so violative of the fundamental law cannot be sustained. The question for consideration is one of power and not of policy, and we are unable to arrive at any other conclusion than that the act of the legislature is in contravention of the constitution.

The act also provides for the election for a representative in Congress and for presidential electors. But this part of the act is not so inseparably connected in substance with the other parts of the act to work the destruction of the whole act. Striking out the provision for the election of state, county, and precinct officers, the act is capable of being carried out in accordance with the legislative intent as to the election of representatives in Congress and presidential electors in the year 1912.

The time for the appointment of presidential electors and the election of representatives in Congress is fixed by the Congress of the United States, and the time fixed is the first Tuesday after the first Monday in November, 1912. It could not be questioned that a provision in the constitution, or in the act of the legislature, fixing a different date, would be void to the extent that the date conflicted. An act of the state of Michigan, fixing the date for the meeting of presidential electors as the first Wednesday of December, when an act of Congress had provided that the electors of each state should meet and give their votes on the second Monday in January next following their appointment, was declared by the supreme court of the United States as in conflict with the act of Congress, and must necessarily give way, yet the act of Congress did not in terms prohibit the meeting at any other time; the state law yielding only to the extent of the collision. *McPherson* v. *Blacker*, 146 U. S. 41, 36 L. Ed. 869, 13 Sup. Ct. Rep. 3.

In that case, on page 34 [146 U. S., on page 10 of 13 Sup. Ct. Rep., 36 L. Ed. 869], after quoting from Senate Rep. 1st Sess. 43 Cong. No. 395: "The appointment of these electors is thus placed absolutely and wholly with the legislatures of the several states. They may be chosen by the legislature, or the legislature may provide that they shall be

elected by the people of the state at large, or in districts, as are members of Congress, which was the case formerly in many states; and it is, no doubt, competent for the legislature to authorize the governor, or the supreme court of the state, or any other agent of its will, to appoint these electors. This power is conferred upon the legislatures of the states by the constitution of the United States, and cannot be taken from them or modified by their state constitutions any more than can their power to elect senators of the United States. Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated,'' Chief Justice Taney said: ''In short, the appointment and mode of appointment of electors belong exclusively to the states under the constitution of the United States. ' They are, as remarked by Mr. Justice Gray, in *Re Green,* 134 U. S. 377, 379 [33 L. Ed. 951, 10 Sup. Ct. Rep. 586, 587], 'no more officers or agents of the United States than are the members of the state legislatures when acting as electors of federal senators, or the people of the states when acting as the electors of representatives in Congress.' Congress is empowered to determine the time of choosing the electors and the day on which they are to give their votes, which is required to be the same day throughout the United States, but otherwise the power and jurisdiction of the state is exclusive, with the exception of the provisions as to the number of electors and the ineligibility of certain persons, so framed that congressional and federal influence might be excluded.'' This case from the supreme court of the United States is a very instructive one, as it bears directly on the principle governing the case at bar.

The question presented being one of power and not of policy, we are unable to arrive at any other conclusion than that the proposed action of the Secretary of State, to prepare and transmit to the board of supervisors of the several counties of the state a notice in writing designating state, county, and precinct officers as officers for which candidates are to be nominated at a primary election, which such candidates so nominated are to be voted for at an election to be held on the first Tuesday after the first Monday in November, 1912, is illegal and without authority of law.

To assert the high prerogative of the state in this behalf by one of its officers without lawful authority so to do would, undoubtedly, cause strife, promote discord and grave legal complications out of which would grow confusion, a multiplicity of lawsuits, and contentions seriously embarrassing the due administration of the several departments of the state government, and unnecessary and illegal expense incurred. Such conditions cannot be encouraged to arise even to gratify political ambitions, for ambition should be made of sterner stuff. We are not concerned with the ambitions of men, but only with the reason and justice of the law.

Accordingly, the judgment of the superior court of Maricopa county, in dissolving the temporary injunction heretofore issued, is reversed and vacated, the temporary injunction is so amended as to include in the writ all precinct offices, and, as amended, the temporary injunction is made permanent. Let the writ issue accordingly.

NOTE.—As to irregularities in calling or conducting elections, see notes in 83 Am. Dec. 749; 90 Am. St. Rep. 46.