STATE, *ex rel.* PAUL C. ALBRITTON, v. J. M. LEE, as Comptroller

183 So. 782.
Opinion Filed September 15, 1938.

*John B. Singeltary* and *George Couper Gibbs,* for Relator.

*Cary D. Landis,* Attorney General, and *H. E. Carter* and *W. P. Allen,* Assistant Attorneys General, for Respondent.

*Kelly & Casler, Paul C. Albritton, Vocelle & Mitchell, Smith & Cannon, Fee* and *Liddon, Maguire* and *Voorhis* and *Thomas H. Anderson,* as *Amicus Curiae.*

PER CURIAM.— The above styled cause is at issue before the Court upon motion of Counsel for Respondent to quash the Alternative Writ of Mandamus issued in the cause. Mr. Chief Justice ELLIS, Mr. Justice BROWN and Mr. Justice BUFORD are of the opinion that the said motion to quash the alternative writ should be denied; while Mr. Justice WHITFIELD, Mr. Justice TERRELL and Mr. Justice CHAPMAN are of the opinion that said motion to quash the alternative writ of mandamus in this cause, be and it is hereby denied.

ELLIS, C. J., and WHITFIELD, TERRELL, BROWN, BUFORD and CHAPMAN, J. J., concur.

TERRELL, J.—On June 26, 1929, the Relator, Paul C. Albritton, was appointed Judge of the Twenty-seventh Judicial Circuit of Florida for a full six-year term. At the time of his appointment, the salary was $7500 per annum but the Legislature of 1931 reduced it to $6750 and the Legislature of 1933 again reduced it to $5000.

By a redistricting Act passed in 1935, the Legislature abolished the Twenty-seventh Judicial Circuit including the office of Judge to which Relator had been appointed. Feeling that the Legislature was without authority to reduce his salary, he brought this proceeding in mandamus to require the Comptroller to draw his warrant against the State Treasurer to pay him (Relator) $6,708.34, said amount

being the difference between the amount he was actually paid as compensation under Chapter 15720, Acts of 1931, and Chapter 15859, Acts of 1933, and the amount he would have been paid under the law in effect when he was appointed had these Acts not been passed. The respondent moved to quash the alternative writ on the ground that it failed to show a legal duty to pay the sum demanded.

On the issue so drawn, we are confronted with the question of whether or not under Section 1 of Article V of the Constitution, the Legislature may reduce the compensation of a Circuit Judge during the term for which he is appointed.

Section 1 of Article V is as follows:

"The judicial power of the State shall be vested in a Supreme Court, Circuit Courts, Court of Record of Escambia County, Criminal Court, County Courts, County Judges and Justices of the Peace and such other Courts or Commissions as the Legislature may from time to time ordain and establish. *The Legislature may prescribe the compensation of the Justices and Judges of the several courts,* but no court heretofore established under the Constitution and Laws of Florida shall be hereby abolished."

The material facts are not in dispute. It is admitted that Relator was appointed judge of the Twenty-seventh Judicial Circuit, June 26, 1929, for a full six-year term, that his salary at the time of appointment was $7500, that it was reduced to $6750 by Chapter 15720, Acts of 1931, and to $5000 by Chapter 15859, Acts of 1933, and that if the Legislature was without authority to pass these Acts, the amount claimed is due and collectible.

The answer to the question with which we are confronted turns on the scope and effect that may be given the sentence, "The Legislature may prescribe the compensation of the Justices and Judges of the several Courts." The briefs

of counsel exhibit much learning and research on this question. Relator contends that to permit such reductions destroys the independence of the Judiciary and hence the independence of the three departments of our government. He supports his thesis with the views of Marshall, Madison, Hamilton and others and urges a learned discussion of the orthography of the word "prescribe" as further support to his contention.

Relator also contends that the question presented must be answered in the negative because there is an express and an implied provision in the Constitution inhibiting the reduction of a circuit Judge's compensation during his tenure in office and because his appointment constituted a contract between him and the state which the Legislature was without power to impair. Baily v. Waters, 308 Pa. 309, 162 Atl. 819; Commonwealth v. Mathues, 210 Pa. 372, 59 At. 961; Commonwealth v. Mann, 5 Watts & S. 403; Long v. Watts, 183 N. C. 99, 110 S. E. 765; and like cases are relied on to support this contention.

Respondent contends on the other hand that the question involved should be answered in the negative because the Legislature had power to raise or lower Relator's compensation and relies on Crawford, et al., v. Payne County Auditor, 12 Cal. App. (2nd) 485, 55 Pac. (2nd) 1240; Garvey, County Auditor, v. Mathews (Tex. Civ. App.) 79 S. W. (2nd) 335; Hawkins v. Jefferson County, 233 Ala. 49, 169 So. 720; State, ex rel Martin, v. Kalb, 50 Wis. 178, 6 N. W. 557; State, ex rel., v. Bartholomew, 176 Ind. 182, 95 N. E. 417; Haggerty v. City of New York, 267 N. Y. 252, 196 N. E. 45; Board of Commissioners of Perry County v. Lindeman, 165 Ind. 186, 73 N. E. 912; Williams v. United States, 389 U. S. 553, 53 Sup. Ct. 751, 77 L. Ed. 1372; O'Donoghue v. United States, 289 U. S. 516, 53 Sup.

Ct. 740, 77 L. Ed. 1356, and Humphrey v. Sadler, 41 Ark. 100, to support his contention.

We have examined these cases and find that those relied on by Respondent to particular statutory courts or to courts created by the Acts of Congress that might be limited or abolished at the pleasure of their creator and were not protected by any provision of the Constitution securing a reduction in compensation. They are consequently of nothing more than persuasive value in reaching a determination of the question before us. As much may be said of the Pennsylvania and other cases relied on by Relator. The Court involved in the latter cases were protected by constitutional provisions securing against a reduction in compensation but the terms and history of the provisions employed were materially different from what we have here.

A vital concern of the framers of the Federal Constitution was to preserve the independence of the judiciary. Among the usurpations charged against the King of Great Britain in the Declaration of Independence was that he "made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries." The injustices incident to such usurpation were fresh in the minds of the makers of the Federal Constitution. For generations they had been oppressed by these injustices, so they provided that Justices of the Supreme Court and Judges of the inferior Courts should be appointed for life and should at "stated times receive for their services a compensation which shall not be diminished during their continuance in office." Section 1, Article III, Federal Constitution.

Most of the states of the union in framing their fundamental law, followed the lead of the Federal Government and wrote provisions in their Constitutions similar to that quoted from the Federal Constitution forbidding the Leg-

islature reducing the compensation of the judiciary during their term of office. The Constitutions of Florida, adopted in 1838, 1861, and 1865, contained provisions of this kind. The Constitution of 1868 contained no provision relating to the compensation of the Judiciary but the present Constitution of 1885 as originally adopted fixed the compensation of both Justices of the Supreme Court and Circuit Judges. Section 1 of Article V as here quoted was an amendment approved in 1914. It dropped the fixed compensation theretofore provided for the judiciary and authorized the Legislature to prescribe their compensation.

The philosophy back of the Federal and State constitutional provisions securing judicial compensation against reduction during tenure was multiple and well grounded. Judges were required to be learned in the law, they were appointed or elected for long terms, were required to renounce all business connections, a practice that they had spent a professional career in building and devote their entire time to the public service. They are unlike other public officials in that upon assuming the duties of office, they are limited to their salary for subsistence and are precluded by law, custom, and the very nature of their employment from taking compensation from any other source. Aside from being precluded from any other source of revenue, the judge is required to make a showing of dignity and independence in the interest of the society he serves that has little or no relation to his personal benefit.

It was also realized by the makers of the Constitution that the judiciary were vested with no tangible power to enforce its decrees or to preserve itself against overt or covert assaults. The executive had placed at his disposal the power of the Army and the Navy to enforce his bidding; and the Legislature was clothed with the power of the purse. Notwithstanding this, the judiciary is vested

with the most delicate function that our democracy is called on to administer, that of adjudicating controversies involving the life, liberty, and property of the individual and the still greater function of settling controversies incumbered by questions of political policy that shape the course of society. These were the considerations that induced the makers of the Constitution to free the tenure and compensation of the judiciary from invasion, that justice might be administered to rich and poor alike without fear or favor from extraneous influences. The courts are, however, in agreement that unless secured by constitutional fiat similar to that contained in Section 1, Article III, Federal Constitution, the compensation of the judiciary may be raised or lowered at the discretion of the Legislature. It is not secured on the theory of contract, the independence of the departments, or on any other theory. Neither is there an inherent right in a member of the judiciary to have his salary continued at the figure he found it when he assumed office. The question of Judicial salary is one of policy and is not saved from legislative invasion unless clearly provided or reasonably inferred from the terms of the Constitution.

Everything Relator says in his brief with reference to the three independent departments of the government and the importance of maintaining an independent judiciary finds ample support in our governmental polity. Our whole theory of democracy is constructed on this plan but it is a significant fact that the line of demarcation separating the three departments, if susceptible of accurate definition, has not been so defined, that there has always existed a certain dependence or interdependence among the three departments, and then it is competent for the people, by constitutional provision, to vest in one department the duties and

prerogatives commonly exercised by another. This has been frequently done in the State Constitutions.

We are conscious of the holding by many Courts (some of which are here cited) to the effect that the Legislature could not reduce the salary of the judiciary during their term of office, but an examination of these decisions reveals that they are grounded on provisions of the Constitution similar to that in the Federal Constitution prohibiting such reduction and not on any other theory. The text writers, while considering the advisability of incorporating such provisions in the Constitution, admit the power of the Legislature to regulate the salary if not so protected. Volume I, Kent's Com. 294 and note page 328; Story's Constitutional Limitations, Volume II, paragraphs 1628 and 1629; State, *ex rel.* Russell, v. Barnes, 25 Fla. 75, 5 So. 698.

This holding may at first blush appear contrary to that in the Pennsylvania cases cited and relied on by Relator but an examination of the cases in the light of Pennsylvania Constitution, the history of its provisions affecting the subject matter and the terms used affords ample basis for the difference in the conclusion reached.

The writer was a member of the House of Representatives that submitted the 1914 Amendment authorizing the Legislature to prescribe the compensation of Circuit Judges and Justices of the Supreme Court. The Legislature had several times considered the matter of raising these salaries but they were fixed in the Constitution and a raise could be affected only by constitutional amendment. One of the arguments urged in favor of the amendment was that the Legislature could be trusted to prescribe judicial salaries, but there was no reason for retaining a fixed salary in the Constitution; so the provision for it was deliberately left

out and the question of fixing judicial salaries vested in the Legislature.

The question of whether or not this was a wise policy, whether or not it strikes down the theory of the independence of the departments, or whether or not there are now influences in our political fabric more subtle and that make it more essential than ever that judicial compensation be safeguarded, is not before us for consideration. These questions were all foreclosed by the 1914 Amendment to the Constitution. The people of Florida expressed themselves on this matter and their expression is not in conflict with dominant Federal law.

But Relator contends that if the Legislature is permitted to prescribe the compensation of the judiciary, it may reduce it to a level so low as to become embarrassing. We do not agree to this contention nor do we think the Constitution in authorizing the Legislature to prescribe the compensation of the judiciary contemplated any such reduction. The power to prescribe Judicial salaries does not vest power to cripple or to destroy a coordinate branch of the government, but implies power to raise or lower within reason and in harmony with treatment accorded other departments. Neither does it contemplate that the judiciary may be singled out and reduced out of proportion to other reductions or that reductions shall be made for any reason except under stress of economic conditions, but as to this, the 1914 Amendment places the judiciary in the same category as the other constitutional departments. It removes all express or implied limitations on the question of judicial salaries. It is not charged that the reduction complained of was embarrassing, below a subsistence level, or below that imposed on others. The policy of this situation, past or present, does not affect its legal status and is not discussed.

We have not overlooked Relator's contention that his appointment and acceptance of the judgeship constituted a contract with the State that the Legislature could not impair, but we are not convinced that there is merit to this contention. Neither are we convinced that Relator is precluded by estoppel from raising the question adjudicated.

From what we have said, it follows that the motion to quash should be granted.

WHITFIELD and CHAPMAN, J. J., concur.

WHITFIELD, J.—Section 5, Article V, of the Constitution of 1838-9 provides that a circuit judge shall "receive for his services a salary of not less than two thousand dollars per annum, which shall not be diminished during the continuance of such judge in office." A similar provision is contained in Section 4, Article V, of the Constitution of 1861; and a somewhat similar provision is in Section 4, Article V, of the Constitution of 1865.

No provision similar to the above appears in the Constitution of 1868 or in that of 1885.

Section 4, Article XVI, Constitution of 1868, contains the following: "The salary * * * of each Judge of the Circuit Court shall be three thousand five hundred dollars."

The salary was by an amendment to the Constitution reduced to two thousand five hundred dollars.

Section 9, Article V, of the Constitution of 1885 provided that: "The salary of each Circuit Judge shall be two thousand five hundred dollars."

Section 8 of Article V, as amended in 1902, provided that: "The salary of each Circuit Judge shall be two thousand seven hundred and fifty dollars."

The provision of Section 1, Article V, of the Constitution; as amended in 1914, that "The Legislature may prescribe the compensation of the Justices and Judges of the

several courts, makes such compensation *a matter of law and not of contract;* and the Constitution does not require the compensation of the Judges to be prescribed with reference to the terms of office of the Justices and Judges.

The word "salary" as used in the provision of Section 43, Article V, of the Constitution, adopted in 1922, that "The Legislature may repeal any law providing for the appointment of an additional Circuit Judge or additional Circuit Judges for a Circuit, but such repeal shall not affect the term, salary and jurisdiction of a Judge holding an appointment," has reference to the compensation as prescribed by the Legislature under Section 1, Article V, as amended in 1914.

The relator was appointed under Section 35 of Article V of the Constitution as amended in 1910, and not under Section 43 of Article V, adopted in 1922.

To mandamus the Comptroller to pay more than is prescribed or appropriated by law would compel him to violate Section 4, Article IX, of the Florida Constitution.

TERRELL and CHAPMAN, J. J., concur.

ELLIS, C. J.—This case presents a question which every member of this Court, I think, would welcome relief from deciding, because it involves to a high degree a critical analysis of the powers of government exercised by the legislative branch in what seems to be an effort on its part to encroach upon the dignity and independence of the judicial branch.

Every student of American History and American and English Law knows that whatever powers of government may exist in the fanciful theories of time serving politicians, three basic, underlying and all controlling and all embracing powers do exist and they are the Legislative, the Executive and the Judicial; that when they are all combined in one person or group a monarchial form of gov-

ernment exists and tyranny is likely to run free reign over the liberties of the people.

Every student of American history knows that to avoid the danger to the liberties of the American people, arising from a combination of two or more of such powers in one person or group of persons, the American system of government was devised which divided the powers enumerated and placed them severally in three separate, distinct, coordinate and independent branches of the government. See Article I, II, and III, Const. U. S.

The Constitution of Florida, as well as many if not all of the Constitutions of other states, definitely provides that no person properly belonging to one of the departments shall exercise any powers appertaining to either of the others. See Art. II, Fla. Const. 1885.

In the case of Commonwealth, *ex rel.* Hepburn, v. Mann, 5 Watts & S. 403, (Pa.) text 406, it was said:

"The great and incorruptible men who formed the glorious fabric of our liberties, completely conversant with the history of the past, and looking with prophetic eye to the future, to avoid the rocks and quicksands which had caused the shipwreck of so many other governments, based as was erroneously supposed on indestructible principles, divided the powers of the government into three independent coordinate branches, the legislative power (I use the words of the Constitution), the executive power, and the judicial power: and for the purpose of protecting the latter, which was the weakest and most exposed to attack, from the encroachments of the former, they established this fundamental principle. They are independent and co-ordinate, because distinct rights, powers and privileges are assigned to them by the Constitution. Each is entitled to the free, unbiased, uninfluenced and independent exercise of all their

rights, powers and privileges in as ample extent as the Constitution allows."

Mr. Justice MILLER, speaking for the Supreme Court of the United States in the case of Kilbourn v. Thompson, 13 Otto (U. S.) 168, 26 L. Ed. 377, text 387, said:

"It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers entrusted to governments, whether state or national, are divided into the three grand departments of the executive, the legislative and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the liens which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system, that the persons entrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other. To these general propositions there are in the Constitution of the United States some important exceptions. One of these is, that the President is so far made a part of the legislative power, that his assent is required to the enactment of all statutes and resolutions of Congress.

"This, however, is so only to a limited extent, for a bill may become a law notwithstanding the refusal of the President to approve it, by a vote of two-thirds of each House of the Legislature.

"So, also, the Senate is made a partaker in the functions of appointing officers and making treaties, which are supposed to be properly executive, by requiring its consent to the appointment of such officers and the ratification of treaties. The Senate also exercises the judicial power of

trying impeachments, and the House of preferring articles of impeachment.

"In the main, however, that instrument, the model on which are constructed the fundamental laws of the States, has blocked out with singular precisions, and in bold lines, in its three primary Articles, the allotment of power to the executive, the legislative, and judicial departments of the government. It also remains true, as a general rule, that the powers confided by the Constitution to one of these departments cannot be exercised by another.

"It may be said that these are truisms which need no repetition here to give them force. But while the experience of almost a century has in general shown a wise and commendable forbearance in each of these branches from encroachments upon the others, it is not to be denied that such attempts have been made, and it is believed not always without success. The increase in the number of states, in their population and wealth, and in the amount of power, if not in its nature to be exercised by the Federal Government, presents powerful and growing temptations to those to whom that exercise is intrusted, to overstep the just boundaries of their own department, and enter upon the domain of one of the others, or to assume powers not intrusted to either of them."

It was said in the case of State v. Osborne, 14 Ariz. 185, text 190, 125 Pac. Rep. 884, that:

"The three coordinate departments of the government—the legislative, executive, and judicial—must each move within its sphere; each must remain separate and distinct; it is so provided by our organic law. Each must act within the scope of the power given it by the sovereign will of the people expressed in their Constitution; thus will difficulties be evaded and perplexities avoided."

The following language appears in the case of State v. Baughman, 38 Ohio State 455:

"The division of the powers of the state into legislative, executive and judicial, and the confiding of these powers to distinct departments, is fundamental. It is essential to the harmonious working of this system that neither of these departments should encroach on the powers of the other."

See also *Ex Parte* Rice, 72 Tex. Cr. Rep. 587, 162 S. W. 891, where it is said that:

" 'It is a maxim of constitutional law that no one of the three great departments of the government shall intrude upon any one of the others, and all attemtps to do so are void.' " Also Greenough v. Greenough, 11 Pa. 489, 51 Am. Dec. 567, text 568, and note.

In the case of Western Union Tel. Co. v. Myatt, 98 Fed. Rep. 335, text 348, Baron Montesquieu is quoted as follows:

" 'When the legislative and executive powers are united in the same person, or the same body of magistrates, there can be no liberty, because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner. Again, there is no liberty of the judiciary power if it be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be the legislator. Were it joined to the executive power, the judge might behave with violence and oppression. There would be an end of everything were the same man, or the same body, whether of nobles or of the people, to exercise these three powers—that of enacting laws, that of executing the public resolutions, and of trying the causes of individuals.' Spirit of Laws, bk. 11, c. 6."

Blackstone is also quoted in the opinion of Western Union Tel. Co. v. Myatt, *supra,* as follows:

" 'In this distinct and separate existence of the judicial power in a peculiar body of men, nominated indeed, but not removable at pleasure, by the crown, consists of one main preservative of the public liberty, which cannot subsist long in any state unless the administration of common justice be in some degree separated both from the legislative and also from the executive power. Were it joined with the legislative, the life, liberty, and property of the subject would be in the hands of arbitrary judges, whose decisions would be then regulated only by their own opinions, and not by any fundamental principles of law, which though legislators may depart from, yet judges are bound to observe. Were it joined with the executive, this union might soon be an overbalance for the legislative.' 1 Bl. Comm. 269."

The following expression was made by James Madison in the Federalist, No. XLVII, p. 270:

"The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."

Chief Justice KENT wrote as follows in the case of Dash v. Van Kleeck, 7 Johns. (N. Y.) 477, text 508, 5 Am. Dec. 291, note:

"It is a well settled axiom that the union of these * * * powers is tyranny. Theorists and practical statesmen concur on this opinion. Our government, like all the other free governments upon this continent, and like the only free government, at present, remaining in *Europe,* consists of departments, and contains a marked separation of the legislative and judicial powers. The constitutions of several of the *United States,* and among others, those of *Massachusetts* and *Virginia,* have an express provision, that the legislative and judicial powers shall be preserved separate and distinct, so that one department shall not exercise the func-

tions belonging to the other. Most of the models of a free and limited constitution which were produced in Europe, under the impulse of the late revolution, and which had any pretensions to skill or wisdom, and particularly the new constitutions of *Poland* and *France* in 1791, and of *France* in 1795, contained the same provision, in language more or less explicit. And if it be not found in our own constitution, in terms, it exists there in substance; in the organization and distribution of the powers of the departments, and in the declaration that the 'supreme *legislative* power' shall be vested in the senate and assembly. No maxim has been more universally received and cherished as a vital principle of freedom. And without having recourse to the authority of elementary writers, or to the popular conventions of *Europe*, we have a most commanding authority, in the sense of the *American* people."

See also 12 C. J. p. 802 where the statement is made that:

"Constitutional government in the United States is distinguished by the care that has been exercised in committing the legislative, executive, and judicial functions to separate departments, and in forbidding any encroachment by one department on another in exercise of the authority so delegated."

It is thus indisputably evidenced in the jurisprudence and history of this country that the system of the division of governmental powers and the confinement of them to the departments severally to which they are confided and the maintenance of the integrity and independence of each department is distinctly an American system which commands the undivided, loyal support of every American citizen until the pillars of this great republic are pulled down and the destiny of succeeding generations shall rest upon a different theory of government.

Mr. Justice ROGERS, in Commonwealth, v. Mann, *supra,*

used the words of the Federalist, which put the thought most forcefully and clearly in the following language:

"Whoever attentively considers the different departments of power must perceive, that in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them. The executive not only dispenses the honours, but holds the sword of the community. The Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction of either the strength or of the wealth of society, and can take no active resolution whatever. It may be truly said to have neither *force* nor *will,* but merely judgment, and to be ultimately dependent upon the aid of the executive arm for the efficacious exercise even of this faculty. This simple view of the matter suggests several important consequences. It proves incontestably, that the judiciary is, beyond comparison, the weakest of the three departments of power; that it can never attack with success either of the other two, and that *all possible care is requisite to enable it to defend itself against their attacks.* It equally proves, that though individual oppression may now and then proceed from courts of justice, the general liberty of the people can never be endangered from that quarter. I mean, so long as the judiciary remains truly distinct from both the legislative and executive. For I agree 'that there is no liberty, if the power of judging be not separated from the legislative and executive powers.'

"It proves in the last place, that as liberty can have nothing to fear from the judiciary alone, but would have everything to fear from its union with either of the other de-

partments; that as all the effects of such an union must ensue from a dependence of the former on the latter, notwithstanding a nominal and apparent separation; that as from the natural feebleness of the judiciary it is in continual jeopardy of being overpowered, awed or influenced by its coordinate branches; that as nothing can contribute so much to its firmness and independence, as permanency in office, to which must be added, as has been already said, *a fixed and adequate support,* this quality may, therefore, be justly regarded as an indispensable ingredient in its constitution, and in a great measure as the citadel of the public justice and the public security. If then the courts of justice are to be considered as the bulwarks of a limited constitution against legislative encroachments, this consideration will afford a strong argument for the permanent tenure of judicial offices, and for a fixed and invariable compensation, incapable of diminution; since nothing will contribute so much as this to that independent spirit in the Judges, which must be essential to the faithful performance of so arduous a duty. This independence of the Judges is equally requisite to guard the Constitution and rights of 'individuals, from the effects of those ill humours which the arts of designing men, or the influence of particular conjunctures, sometimes disseminate among the people themselves; and which, although they speedily give place to better information and more deliberate reflection, have a tendency in the meantime to occasion dangerous innovations in the government, and serious oppressions of the minor party in the community.' " Text 410.

It thus appears that the American System is like a great tripod, strong, permanent, substantial and efficient so long as its three great legs are maintained in their primitive strength. If any one of the departments is weakened in the exercise of its supreme power committed to it under our

system, either in the completeness or independence of its activities, by any other department, then the entire superstructure is in danger, because the foundation upon which it rests is in process of deterioration.

I do not wholly subscribe to the doctrine that any one department of the government is weaker or stronger than any other department because each and every power of the government is essential to its complete and ideal functioning; that is to say, while it is one function of government to prescribe the law, it requires the exercise of another and distinct power to enforce it, and, since judgment is essential to determine what the law is, it is evident that the power of so judging is just as important as that of making or executing it.

The American system of government fully recognizes this truth and it is crystallized in the written constitutions, both Federal and State. It is true that security of tenure in office through which any power of government is exercised is essential to the American system. It is also true that the free and unhampered exercise of judgment wherever reposed in an officer in any department of government is essential to the complete exercise and discharge of the trust committed to him. While the legislative power may cover a broader field of governmental activities than either the executive or judicial powers it is in no sense a legislative function under the American system directly or indirectly to interfere with or control the powers exercised by any officer in either of the other two departments. In other words, while the legislative branch of the government is supreme within the sphere of its legitimate activities, the executive and judicial departments are equally supreme within the legitimate sphere of their respective activities.

The general impression .which may exist · among the
people that the legislative branch of the government is the
most powerful of the three arises doubtless from the fact
that aside from its being the most spectacular in its op-
erations there is committed to it the duty of providing rev-
enue by the power of taxation for the expenses of the gov-
ernment and the enactment of laws for the general welfare
and in the exercise of the police power. In the discharge of
these duties, particularly those relating to taxation and the
general welfare, the Legislature is beset by the applications
of innumerable groups each interested in the promotion of
its peculiar and special welfare, thus conflicting group in-
terests are represented at each session of the Legislature
and periodically the people of the entire State are aroused
to a sense of potential benefit or injury from legislative
activities.

Office seekers, job hunters, lobbyists, representing dif-
ferent commercial, agricultural and industrial interests
come to the capital while the Legislature is in session and
newspapers broadcast the news of different activities of
the legislative session for the full period of its time, but
whatever may be the legislative burden at such time and
whatever may be the character of legislation which emerges
from that body during its session, whether orderly and pre-
cise or kaleidoscopic in arrangement and color, it must, in
order to be legitimate legislation, lie within the legislative
power as that term is understood within the true meaning
and conception of the American system.

The exercise of the power of taxation to provide revenue
for the expenses of the government is another duty of the
legislative branch which in its discharge awakens the inter-
est and sometimes the apprehension of the people as to what
may be the legislative purpose in that regard and helps to
create the impression of the superior power of the legisla-

tive branch. That, however, is a duty lying within the sphere of legislative power and no comparison is permissible between that power and the power executed by either of the other two branches: the one to exercise supremely its judgment as to the intent and purpose of such legislation, and the supreme power of the other to execute the legislative will as interposed by the judicial branch.

Our Constitution definitely requires the Legislature to provide revenue for defraying the expenses of the State. See Sec. 2, Art. IX, Const. 1885. Thus our system of government definitely contemplates that the discharge of its functions and the administration of its public business in all departments entails expenses which must be met by the raising of revenue by the power of taxation. These expenses consist mainly of the salaries of officers and employees of the different departments, which the Legislature may in some cases fix from time to time during the term of office, and in other cases definitely prescribe for the term of the office to be filled.

In the case of the judicial branch, whose sole function is judging, it is essential that its complete and ideal exercise should not be hampered through fear that the tenure of office of a judge may be terminated at pleasure by either the legislative or executive branches, or that the adequate sustenance or any portion of it may be taken from him by legislative will during the term of the office in which he has been duly installed after adequate provision for such sustenance has once been prescribed before the beginning of such term.

In his excellent work, Commentaries on American Law, which has been recognized since 1826 as containing a clear and correct elucidation of the fundamental principles of the American governmental system, Honorable James Kent expresses the thought in the following words:

"It would be in vain to declare that the different departments of government should be kept separate and distinct, while the Legislature possessed a discretionary control over the salaries of the executive and judicial officers. This would be to disregard the voice of experience and the operation of invariable principles of human conduct. A control over a man's living is, in most cases, a control over his actions." 1 Kents Com., page 281.

Again at page 294 of Kent's Commentaries is to be found the following language:

"It is requisite that the courts of justice should be able, at all times, to present a determined countenance against all licentious acts; and to deal impartially and truly, according to law, between suitors of every description, whether the cause, the question or the party, be popular or unpopular. To give them the courage and the firmness to do it, the judges ought to be confident of the security of their salaries and station. Nor is an independent judiciary less useful as a check upon the legislative power, which is sometimes disposed, from the force of party, or the temptations of interest, to make a sacrifice of constitutional rights; and it is a wise and necessary principle of our government, as will be shown hereafter in the course of these lectures, that legislative acts are subject to the severe scrutiny and impartial interpretation of the courts of justice, who are bound to regard the Constitution as the paramount law, and the highest evidence of the will of the people.

"The provision for the permanent support of the judges is well calculated, in addition to the tenure of their office, to give them the requisite independence. It tends, also, to secure a succession of learned men on the bench, who, in consequence of a certain undiminished support, are enabled and induced to quit the lucrative pursuits of private business for the duties of that important station. The Consti-

tution of the United States, on this subject, was an improvement upon all our previously existing Constitutions. * * * the * * * certain provision in the Constitution of the United States has been wisely followed, in the subsequent constitutions of most of the individual states."

It was said by James Madison in The Federalist:

"In order to lay a due foundation for that separate and distinct exercise of the different powers of government, which, to a certain extent, is admitted on all hands to be essential to the preservation of liberty, it is evident that each department should have a will of its own. * * * It is equally evident, that the members of each department should be as little dependent as possible on those of the others, for the emoluments annexed to their offices. Were the executive magistrate, or the judges, not independent of the Legislature in this particular, their independence in every other would be merely nominal." Page 290, *et seq.*

It was also said by Mr. Madison, according to his notes in the Constitutional Convention, that:

"Experience in all the States had evidenced a powerful tendency in the Legislature to absorb all power into its vortex. This, said he, was the real source of danger to the American Constitution, suggested giving every defensive authority to the other departments that was consistent with Republican principles." Documentary History of the Constitution, Vol. 3, page 392.

It is, therefore, perfectly evident from a careful examination of the American system of government that it is not within the power of the legislative branch unless expressly and clearly conferred upon it by the written Constitution to enact laws which either interfere with the tenure of office of an executive or a judicial officer or effect the curtailment of the adequate provision made for the sustenance of such officer during the term for which he is elected or· chosen;

that to exercise such power is not legislation but tyranny and operates to the partial if not complete subjugation of both executive and judicial functions to the legislative will.

It thus follows that if an interference by reduction of the salary of an incumbent of a judicial office affects either directly or indirectly the incumbent's freedom of judgment in the exercise of his duties, then the power vested in the Legislature to prescribe the salary for such officer can be construed only to mean a power to prescribe an adequate compensation and not a power to reduce that compensation during the term of office of the incumbent and such power should not exist by implication because the exercise of the latter power would not be legislative in character, for the power by legislation to reduce the compensation of an incumbent of a judicial office is diametrically opposed to the fundamental principles on which our government is organized.

I submit that the exercise of such a power is abhorrent to the sense of loyalty of every American citizen to our system of government, and should not under any pretense or for any excuse be recognized as the legitimate exercise of the legislative function.

The relator in this case, Paul C. Albritton, was appointed by the Governor and confirmed by the Senate of the State of Florida to be Judge of the Twenty-Seventh Judicial Circuit of Florida for a term of six years to begin from the 26th of June, 1929. The salary or compensation which had been prescribed by the Legislature under Section 35 of Article V of the Constitution by Chapter 11888, Laws of Florida, 1927, was the sum of $7,500 per year. In 1931, by Chapter 15720, the compensation for Circuit Judges was reduced by legislative enactment to the sum of $6,750.00 per year. Again in 1933 the Legislature by Chapter 15859 reduced the salary to be paid Circuit Judges to the sum of

$5000.00 per year, and at the latter rate the relator was paid until July 30, 1935, when under Chapter 17085, Laws of 1935, there was a redistricting of the State into Judicial Circuits and the additional judgeship for the Twenty-Seventh Circuit was abolished.

It thus appears from the allegations of the alternative writ that the relator, Judge Albritton, was not paid for the term of his office as Judge of the Twenty-Seventh Circuit the compensation of $7500.00 per year which had been prescribed as compensation for his sustenance when he accepted the appointment to that office and entered upon the discharge of his duties as Judge of the Circuit.

It therefore appears that the State during the term of office held by the relator, under the Acts of the Legislature mentioned, reduced his compensation for the term by the sum of approximately $6,708.34, according to the allegations of the writ.

On December 3, 1936, Judge Albritton applied for and obtained from this Court an alternative writ of mandamus to require Honorable J. M. Lee, Comptroller of the State of Florida, to draw his warrant in favor of the relator for the amount of said deficit.

The case thus presented by the relator is that the Acts of the Legislature of 1931 and 1933, undertaking to reduce the compensation of the relator as Circuit Judge when he accepted the appointment to said office are ineffective as to relator and of no effect.

On December 9th the respondent interposed a motion to quash the alternative writ, thus the question of the effectiveness as to the relator of the two Acts of the Legislature above mentioned, viz.: Chapter 15720, Laws of 1931, and Chapter 15859, Laws of 1933, is presented for determination by this Court.

It seems that the concensus of judicial opinion in this

country is to the effect that the relation existing between the State and the incumbent of judicial office is not of such a contractual character as to be within the protection of Article I, Section 10, of the Federal Constitution. The rule as stated in 33 C. J. 953 is as follows: "The selection of a judicial officer does not create a contract between the incumbent and the state." The citations given in support of that text are: U. S. v. Fisher, 109 U. S. 143, 3 Sup. Ct. Rep. 154, 27 L. Ed. 885; Benford v. Gibson, 15 Ala. 521; Com. v. Matheus, 210 Pa. 372, 59 Atl. 961.

In the Fisher case above cited, Judge J. W. Fisher held the office of Chief Justice of the Territory of Wyoming from February, 1876, to November, 1879. During that period his salary was reduced by an Act of Congress $400 per annum. The Judge brought an action in the Court of Claims against the United States to recover the difference between the amount of his salary as fixed by the congressional Act of 1870 and the amount fixed by the Act of 1877 which reduced the salary of the Judge about $400 a year. Judge Fisher contended that he was entitled to receive compensation for his services as Judge at the rate fixed by the Act of 1870 when he entered upon the term of his office.

The holding of the court in that case was that there was no clause in the Federal Constitution forbidding Congress to reduce the compensation of the Judge of a Territorial Court during his term of office and that Congress could, without the violation of any contract with the incumbent, reduce the salary during his term of office and had the constitutional power to do so.

The case of Butler, et al., v. Com. of Pa., reported in 10 Howard 402, 13 L. Ed. 472, was cited to the proposition that no contractual relation existed between the incumbent of a judicial office of the territory of Wyoming and the United States Government. In the Butler case the office

involved was not a judicial office. The plaintiffs in error had been appointed by the Governor of Pennsylvania as Canal Commissioners at a salary of $4.00 a day and by a subsequent Act of the Legislature the appointment to such employment was transferred from the Governor to election by the people and the compensation fixed at $3.00 per day. The plaintiffs in error insisted that for the remainder of their appointment by the Governor their compensation should be at the rate of $4.00 per day instead of under the terms of the new Act which went into effect before the time that their appointment expired. The Supreme Court of Pennsylvania did not sustain that view and on writ of error to the Supreme Court of the United States that Court held that the:

"Contracts designed to be protected by the tenth section of the first article of that instrument are contracts by which perfect rights, certain definite, fixed private rights of property are vested. These are clearly distinguishable from measures or engagements adopted or undertaken by the body politic or State government for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require. The selection of officers, who are nothing more than agents for the effectuating of such public purposes, is matter of public convenience or necessity, and so, too, are the periods for the appointment of such agents; but neither the one nor the other of these arrangements can constitute any obligation to continue such agents, or to reappoint them, after the measures which brought them into being shall have been found useless, shall have been fulfilled, or shall have been abrogated as even detrimental to the well-being of the public. The promised compensation for services actually performed and accepted, during the continuance of the particular agency, may undoubtedly be

claimed, both upon principles of compact and of equity; but to insist beyond this on the perpetuation of a public policy either useless or detrimental; and upon a reward for acts neither desired nor performed, would appear to be reconcilable with neither common justice nor common sense. The establishment of such a principle would arrest necessarily everything like progress or improvement in government; or if changes should be ventured upon, the government would have to become one great pension establishment on which to quarter a host of sinecures. It would especially be difficult, if not impracticable, in this view, ever to remodel the organic law of a State, as constitutional ordinances must be of higher authority and more immutable than common legislative enactments, and there could not exist conflicting constitutional ordinances under one and the same system. It follows, then upon principle, that in every perfect or competent government, there must exist a general power to enact and to repeal laws; and to create, and change or discontinue, the agents designated for the execution of those laws. Such a power is indispensable for the preservation of the body politic, and for the safety of the individuals of the community. It is true, that this power, or the extent of its exercise, may be controlled by the higher organic law or Constitution of the state, as is the case in some instances in the state constitutions, and is exemplified in the provision of the federal Constitution relied on in this case by the plaintiffs in error, and in some other clauses of the same instrument; but where no such restriction is imposed, the power must rest in the discretion of the government alone. The Constitution of Pennsylvania contains no limit upon the discretion of the Legislature, either in the augmentation or diminution of salaries, with the exception of those of the governor, the judges

of the Supreme Court, and the presidents of the several courts of common pleas."

The Canal Commissioners of Pennsylvania were not judicial officers but were mere agencies of the government to perform certain work which according to its nature and character might in the judgment of the commonwealth as expressed by legislative enactment be changed or entirely abandoned whenever the necessities for the further execution of the work required; the Supreme Court apparently taking the view that such an employment as Canal Commissioner was accepted by the employee subject to the superior authority of the sovereign power to amend the terms of the employment either as to the term of employment or compensation to be allowed as the necessities of the commonwealth demanded.

In the case of Benford v. Gibson, 15 Ala. 521, the guardian of a ward in the settlement of his claims against the estate in the Orphans' Court presented an item of costs which he had paid to the County Judge under the provisions of an Act of the Legislature of 1843 which allowed a larger compensation for the services than the provisions of the Act of 1848, according to the terms of which the orphan claimed the County Judge should have made his charges. The question involved was the reduction of fees allowable to the County Judge during his term of office, the Supreme Court of Alabama holding that "we are satisfied, that the appointment to office, by a state government, is not to be considered as a contract, in the sense of that term, as used by the framers of the Constitution." Text 525.

The language of this holding seems to concede that the elements of a contract in such a case are present but that because of the peculiar nature and character of the contract and the superior authority of sovereignty to amend or abolish it at will it is not such a contract as is protected by

the Federal Constitution and that the incumbent accepts the office subject to this superior sovereign power.

In the case of Commonwealth v. Matheus, 210 Pa. 372, 59 Atl. Rep. 961, the question arose upon the construction of the Act of 1903 of the State of Pennsylvania, which increased the salaries of the judges of its courts over that which had been fixed by a previous Act. In discussing the procedural question involved the court recognized the existence of a private right in the judges to the salary fixed by statute during his term of office for services rendered while in the discharge of the duties of his office, but said that the existence of such a private right did not exclude the presence of a public duty to be performed which was involved in the payment by the State to the judge of his salary according to the increased rate. The Court, through Mr. Justice von Moschzisker, who afterwards became Chief Justice of the Court, said:

"As we have already indicated, the fact that the writ in this case may serve a private interest does not in any way exclude the presence of a public duty to be performed. The public at large is most essentially and materially interested in the maintenance of the judiciary as one of the necessary and independent divisions of the government; the Constitution requires that they shall be paid by the state an adequate compensation, and the question is one of such public importance that the enforcement of the public duty to pay, under authority of law, the salaries of the judiciary, is one which should not depend upon the willingness of any individual judge, in his private capacity, to attempt to enforce his right as a matter of private benefit." Text 377.

The Constitution of Pennsylvania 1873, Art. V, which is the Judiciary Article, Sec. 18, provided that:

"The judges of the Supreme Court and the judges of the several courts of common pleas and all other judges

required to be learned in the law, shall at stated times, receive for their services an adequate compensation, which shall be fixed by law and paid by the State."

The old Constitution of the State of Pennsylvania of 1790 contained the clause that the judges should receive "an adequate compensation, to be fixed by law." That clause was contained in the Constitution of 1838 and reenacted into the Constitution of 1873, under consideration in the case. The two older Constitutions contained the further clause that the compensation to be fixed should not be "diminished during their continuance in office." The Constitution of 1873 omitted the clause that their compensation should "not be diminished during their continuance in office," but merely provided that the compensation should be an adequate one.

The court considered the etymology of the word "adequate" and pointed out that the proper meaning to be given to it in the connection in which it was used was that the compensation to be allowed should be appropriate to the standards of living which the progress and development of society might require, to the end that the compensation to be allowed should be sufficient by way of sustenance for the incumbent of the office.

The Court held that constitutional clause to be an absolute mandate upon the Legislature to provide "adequate compensation" for the judges. The Court also pointed out that the word "fixed" could not be construed to be an inflexible term and that when salaries were once fixed by the Legislature the power of the Legislature was not exhausted; holding that such a construction would be contrary to latter-day constitutional construction.

There was another provision in the Constitution of 1873 not contained in the judiciary article, but which related to other officers and which provides that: "No law shall

extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment." 210 Pa. text 397. The Court held that such article of the Constitution had no relation whatsoever to judicial officers and those sections of the Constitution which related to provisions for their adequate compensation, and upon this subject the learned Justice said:

"Are the judiciary dependent upon Section 13 of Article III to prevent the Legislature from diminishing their salaries during the term for which they may have been elected? It is not essential to the question before the court to decide as to the right of the Legislature to diminish the salary of a judge during the term for which he may have been elected, and we do not make any decision on that point at this time, but we state most emphatically that it is our belief that the Legislature have no right to diminish the salary of a judge during the term for which he may have been elected, and that this protection to the judiciary is not in any sense dependent upon Section 13 of Article III of the present Constitution of the state." Text 399.

Upon the subject of the alleged contractual relation existing between an incumbent of a judicial office and the State, the learned Justice said, in substance, that a Judge in accepting a term with a definite salary attached to it at the time did not enter into a contractual engagement with the State that he would serve out his term without an increase of salary. The Court said that many well considered cases have decided that there is no such contractual relation existing between the public and those that serve it in official capacity. The Court cited the case of Com. v. Mann, *supra*, to this proposition.

The substance of the holding by these authorities upon the subject of a contractual relation existing between the incumbent of a judicial office and the State is that the na-

ture of the contract is not such as is protected by the 10th Section of Article I of the Federal Constitution. However, it appears from the discussion of the question that the courts recognize the existence of all elements of a contractual relation, but merely conclude that by reason of the superior authority of State sovereignty, to which the nature and character of the duties required of the public officer and the term of his office and even the abolishment of the same are subject, which the necessities of social conditions require, the relation is deprived of such permanency as that it may be said that the incumbent may continue in the performance of his duties notwithstanding the welfare and convenience of the State may otherwise require.

Upon this subject, however, Judge Ruffin, of the Supreme Court of North Carolina, in the case of Hoke v. Henderson, 4 Dev. 1, 15 N. C. 1, 25 Am. Dec. 677, presents a contrary view in such excellent and convincing terms that one is forced to the conclusion that while the contract may not be such an one as is protected by the provisions of the Federal Constitution mentioned, all the elements of a contract do exist in the relation between the incumbent of a judicial office and the State but that the incumbent is solely dependent upon the honor of his State for the continued payment of the salary which was prescribed by the Legislature to be paid when the incumbent entered upon the duties of his office.

From the standpoint of a contract there can be no doubt that the relator is entitled to his writ because all of the elements of a contract, competent parties, lawful subject matter, consideration and agreement of minds, exist.

Every student of the American system of government knows that the system contemplates adequate compensation for the services of its officers in all departments for their sustenance during their terms of office; that is an implied

if not an expressed principle in the American system, for in all constitutions both federal and state provision is made for paying the expenses of the government by the exercise of the power of taxation; and the expenses of government consist largely in the salaries to be paid the officers of the different departments to which are committed the several powers of the government.

The State Constitution expressly commands the Legislature to prescribe the salaries to be paid Circuit Judges thus the power is given by the people so to do. See Sec. 1 of Art. V, Const.:

"The judicial power of the State shall be vested in a Supreme Court, Circuit Courts, Court of Record of Escambia County, Criminal Courts, County Courts, County Judges and Justices of the Peace and such other Courts or Commissions as the Legislature may from time to time ordain and establish. The Legislature may prescribe the compensation of the Justices and Judges of the several courts," etc.

There is the element of competent parties to contract and be contracted with: the State and the person selected to perform the judicial function of judging in a controversy between citizens or between the government and its citizens; the subject matter is lawful because it is expressly provided for in the system; the consideration is apparent, the compensation offered in the one case and the services to be rendered in the other and the meeting of the minds or agreement of the parties as to the services to be rendered and the compensation to be paid therefor.

By reason of the appointment of a citizen by the State to an office and the acceptance of such appointment by him he changes his economic and professional status; he abandons the practice of his profession, leaves his clientele and in some instances changes his place of residence and method

of living and enters the service of the State. The consideration moves from one of the parties to the other; the one to pay, the other to render the service. There is agreement, or the meeting of minds, thus all the elements of a contract exist: competent parties, lawful subject matter, valid consideration and agreement of minds.

The American system contemplates, even expressly provides, for such relationship between the government and its citizens with whom it intrusts a part of the sovereign power. That proposition cannot be successfully disputed.

The theory of the duty of a citizen to serve the State in any civil capacity freely and without compensation for his services has never been the will of the American people nor has it ever been written by them into any constitution, federal or state and is no part of the American system of government.

There are provisions in both the Federal and State Constitutions forbidding the enactment of laws impairing the obligations of contracts. See Sec. 17, Decl. of Rights, Const. of Fla. 1885, Sec. 10, Art. I, Const. U. S.

All these facts being true, on what principle can it be successfully maintained that the Legislature has implied power to violate the obligation of such a relationship? The person named to the office to discharge the duties thereof for a term and at a salary which has by constitutional mandate been prescribed by the Legislature relies upon the honor of the State and has faith in its fair treatment of him in the matter of security to him both in compensation and the term of office. Yet there are those who perceive in the relation between the State and one of its officers an element not recognized in the American system of government; that is to say, the power of the government through the Legislature to trade with the citizen on the

honor which is conferred on him by his investiture of sovereign power in the particular office in which his services are to be rendered and say to him, through that agency, the honor which you enjoy is sufficient compensation for your services notwithstanding the honor of the State is pledged to the continued payment to you of your salary in the amount and for the term already by constitutional authority prescribed.

Such sophistry, in view of the American system of government, is transparent and destructive of democratic principles because in many cases the people by their votes have placed the particular officer in his position of service for a definite term at an agreed compensation. When such an Act of the Legislature occurs, what becomes of the expressed will of the people at the polls, or their expressed will manifested through the executive in the appointment and the confirmation of the officer by the Senate, both of which by the Constitution are made agencies of the people for the selection of the person to service?

How does it come about that the holder of a county or municipal bond, issued without express constitutional authority and even by doubtful implication, applying to the court for a writ of mandamus to compel the state taxing agency to perform its obligation to levy a tax upon the people for debt service, seems to have no trouble in arousing a keen legal sense on the part of the Judge as to the obligation of the contract, while a citizen of the State under an obligation made by the State with him under express constitutional authority may find no recognition of his right to a full performance by the State of its agreement with him?

Does the trouble lie in the lack of judicial independence on the part of elective or appointive judges through fear of electoral or legislative displeasure, which calamity the framers of the American system of government endeavored

so diligently to prevent, but which now through a later interpretation of our system seems to have been in vain? Does such fear disturb judicial serenity and paralyze a judge's sense of abstract justice? If so, it is most devoutly to be wished that by some means a sense of exalted justice, such as Washington desired, or a sense of righteous purposes, such as Wilson hoped might exist, may rejuvenate the mental processes of our judges and make over the functions of the judicial branch.

But the question here lies even deeper than that of contractual obligation. It lies at the very foundation of the American system of government, for if this relator is not entitled to his writ in this case, then the Legislature has power to control the judgment and will of the judicial branch of the government.

I assume that the following postulates are so much a part of the woof and warp of the American system of government that to remove them would be to destroy the entire fabric. These postulates are, first, the separation of the powers of government into three separate, clearly defined, equal and co-ordinate and independent departments; secondly, an adequate compensation for the sustenance of each citizen selected by authority of the people to perform and discharge any sovereign power of the State during the term of office to which the citizen may be selected; third, the security of every citizen chosen to a judicial office in the possession of his term of office, compensation provided therefor and from interference by the arbitrary action of any department; fourth, the exercise of the sovereign power of taxation solely by the Legislative Department to raise revenue for the expenses of the government; fifth, that the expenses of the government include mainly provisions for the adequate sustenance of the government's officers by way of salaries in consideration of the duties required of

them to be performed; sixth, that except where such sustenance by way of salaries is expressly provided for by constitutional provisions, the Legislature has power to prescribe such compensation for each office to be held by the citizen to be selected to discharge the functions and duties of the office for the term for which he is chosen; seventh, that the legislative power consists in the enactment of statutes under authority of the governmental power of taxation, the police power and in the interest of public welfare.

If those principles are sound and lie at the base of the American system of government, it would seem that to deprive a judicial officer of his compensation for sustenance or any part thereof during his term, would require express constitutional authority for the Legislature to accomplish, as such attempt on the part of the Legislature does not lie within the recognized polity of the American system of government.

As the relation existing between the government and a judicial officer in whom is vested some portion of the sovereign power for a definite term and at a compensation for his sustenance prescribed by the Legislature under constitutional authority at the beginning of the term, partakes of the nature of contractual relations for the faithful execution of which the officer may rely only upon the honor of his State, the fact that he has no redress in the courts by way of a suit for damages for breach of the agreement on account of a legislative action reducing the compensation of the officer during his term does not destroy the elements of the agreement existing.

If express authority is required for a legislative Act reducing the compensation of a judicial officer during his term, and such authority does not exist in the provisions of the Constitution, then such an Act passed without proper authority is beyond the scope of legislative power and par-

takes of the nature of an interference with the independent will and judgment of the judicial officer.

It has been said that no calamity could be greater to our government than a judiciary whose independence of will and judgment may be affected either by private sale of its judgments or by threat of legislative action to destroy the economic security which it is the fundamental principle and policy of the government to secure to° such officers, and what threat is more effective than for the Legislature to hold over the judiciary the punitive rod of economic chastisement? Indeed in what other manner may the Legislature undertake to influence the independent will and judgment of the judicial branch? In such a case what is a judicial officer to do? Should he continue the discharge of his duties at his own expense and supply from his own funds the means whereof to provide sustenance for himself and family, which would be in violation of a fundamental principle of the American system of government, or should he "crook the pregnant hinges of the knee where thrift may follow fawning," and become a mendicant, suppliant before the tyrannical throne of so-called legislative authority, or seek the crumbs for support of himself and his dependents at the overladen tables of the executive and legislative branches?

Under the principle which seems to pervade the majority opinion the latter alternative exists, which is repugnant to every sense of honor and loyalty to the American system of government.

As was said by John Marshall in his Debates in the Virginia Convention, 1829-1831, p.p. 616, 619, regarding the duties of the judiciary:

"Advert * * * to the duties of a judge. He has to pass between the government and the man whom that government is prosecuting; between the most powerful individual in

the community and the poorest and most unpopular. It is of the last importance that, in the exercise of these duties, he should observe the utmost fairness. Need I press the necessity of this? Does not every man feel that his own personal security and the security of his property depends on that fairness? The judicial department comes home in its effect to every man's fireside; it passes on his property, his reputation, his life, his all. Is it not to the last degree important that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience? * * * I have always thought, from my earliest youth until now, that the greatest scourge an angry heaven ever inflicted upon an ungrateful and sinning people was an ignorant, a corrupt, or a dependent judiciary."

A careful reading of the majority opinion reveals that a thought pervades it which is not sustained in my judgment by the processes of reasoning, because it seems to hold that in a proper case presented such Acts of the Legislature as those which are attacked in this proceeding may be declared to be invalid because unreasonable.

That, in my judgment, is a flimsy and transparent solecism because the judicial branch has no power to strike down a legitimate Act enacted within the scope of legislative authority pertaining to general Acts in the interests of the general welfare or enactments under the sovereign power of taxation, and these Acts may not be classed in either category, nor may they be classed as enactments in pursuance of the exercise of the police power, because their object is neither health, morals, peace or public convenience. This Court has many times stated, and often in the words of the learned Justice who wrote the majority opinion in this case, that with the wisdom and policy of legislative enactments this Court has no concern.

See State v. Bryan, 50 Fla. 293, 39 South. Rep. 929; Stewart v. DeLand-Lake Helen Special Road, etc., Dist., 71 Fla. 158, 71 South. Rep. 42; Bloxham v. Fla. Cent., etc., R. Co., 35 Fla. 625, 17 South. Rep. 902; Burnett v. Green, 97 Fla. 1007, 122 South. Rep. 570, 69 A. L. R. 244; State v. Johns, 92 Fla. 187, 109 South. Rep. 228; State v. Giblin, 98 Fla. 802, text 818, 124 South. Rep. 375; State v. Dyer, 109 Fla. 33, 148 South. Rep. 201.

While legislative enactments have been held by this Court to be unreasonable they have been enactments purporting to be within the police power. The unreasonableness which is sufficient to strike down such Acts must consist in their failure to bear a proper relation to health, morals, peace and public convenience, but as the Acts attacked in this proceeding do not purport to be enactments under the police power this Court is without power to strike them down if they are lawful enactments under the taxing power or under the power to prescribe rules and regulations in the interests of the general welfare. Sweat v. Turpentine & Rosin Factors, Inc., 112 Fla. 428, 150 South. Rep. 617.

If the Acts which are under attack in this proceeding may not be declared invalid as being in violation of the principle which inhibits the Legislature from enacting any law violating the obligation of a contract, they are amenable to the criticism that the authority to enact such statutes vests in the legislative branch the power at its will to invade the judicial authority and function by destroying or impairing the independent will and judgment of the officers of such branch by removing from them the economic security afforded to them by the policy of our system of government. See the words of Hamilton in The Federalist No. 79, p. 440:

"In the general course of human nature, a power over a man's subsistence amounts to a power over his will and

we can never hope to see realized in practice the complete separation of the judicial from the legislative power in any system which leaves the former dependent for pecuniary resource on occasional grants of the latter."

Section 1 of Art. V, Const. of Florida, *supra,* in the following language, impliedly prohibits the Legislature from reducing the salary of a judicial officer during his term: "The Legislature may prescribe the compensation of the Justices and Judges of the several courts."

The word *prescribe* carries with it the express inhibition to reduce the compensation of judicial officers because it means that the salary to be paid shall be written before the term of the judicial officer begins and not afterwards. This thought is confirmed by Section 43 of Art V, which provides that:

"The Legislature may repeal any law providing for the appointment of an additional Circuit Judge, or additional Circuit Judges for a Circuit, but such repeal shall not affect the term, salary and jurisdiction of a Judge holding an appointment."

That phrase in the Constitution expressly limiting the power of the Legislature in this regard can have no other meaning than that the Legislature shall not have power to interfere with either the term, jurisdiction or salary of an additional judge. If the Legislature may not by Act interfere with the term, salary or jurisdiction of an additional judge how may it lawfully by legislative enactment reduce his salary during the term for which he was selected?

The history of the constitutional provisions on the subject of judicial salaries as referred to in the majority opinion is accurate so far as the learned author of that opinion takes it, but it may be well to consider other provisions in the judiciary article relating to the right of a judge to receive through the term of his office the salary which was pre-

scribed by the Legislature when he entered upon the duties thereof.

In 1910 the business, growth, increased population and general welfare of the State made it apparent to the people that the establishment by the Legislature of additional judicial circuits and provision for the appointment of additional judges therefor was necessary, so the amendment to Section 35 of Art. V of the Constitution was adopted. That amendment is as follows:

"No Courts other than herein specified shall be established in this State, except that the Legislature may provide for the creation and establishment of such additional Judicial Circuits as may from time to time become necessary, and for the appointment by the Governor and confirmation by the Senate of Additional Circuit Judges therefor, whose terms of office and general jurisdiction shall be the same as is herein provided for the Circuit Judges, herein already provided for, and may clothe any Railroad Commission with Judicial powers in all matters connected with the functions of their office."

Following the adoption of this amendment, the Legislature in 1911, by Chapter 6197 established three additional Circuits to be known as the Ninth, Tenth and Eleventh Judicial Circuits. This Act defined the territorial limits of such additional Circuits and redefined the territorial limits of the eight original Circuits as they were defined by the Legislature under the provisions of Section 8 of Art. V of the Constitution.

The Act further provides for the appointment of a judge for each of such three additional Circuits. Under the terms of the constitutional amendment these judges became additional circuit judges who were to exercise judicial power in the three additional circuits.

In 1915 by Chapter 6899 the Legislature provided for the establishment of an additional circuit to be known as the Twelfth Additional Circuit and provided for the appointment of two additional judges therefor, defined the territorial limits of the Additional Twelfth Circuit and redefined the territorial limits of the Fourth and Eighth Circuits. Under the provisions of that Act Honorable J. Turner Butler was appointed additional Judge of the Twelfth Judicial Circuit and Honorable S. J. Hilburn was appointed Judge of the redistricted Fourth Circuit.

In the case of State, *ex rel.* West, v. Hilburn, 70 Fla. 55, 69 South. Rep. 784, the Court held the entire Act to be unconstitutional and inoperative because of the invalid provisions "for two Circuit Judges for the Twelfth Judicial Circuit * * * and because of the manifest interdependence of its provisions."

In the case of State, *ex rel.* West, v. Butler, 70 Fla. 102, 69 South. Rep. 771, the Court held that because the appointment of Judge Butler made two judges for the Fourth Circuit his appointment was declared invalid under the authority of the Hilburn case, *supra,* the Court saying in the case that because the statute provided for the appointment of two Circuit Judges for one Circuit "it is in direct conflict with the still potential provision and limitation of Section 8 of Article V, that 'one Judge shall be assigned to each Circuit'; consequently such provision of the statute is inoperative, and the appointment of the respondent as Circuit Judge for a Circuit in which there is already one Circuit Judge, is without authority of law under the Constitution of this State." Text 143.

In those cases I expressed the view that under the provisions of the constitutional amendment adopted in 1910 the establishment by the Legislature of the Ninth, Tenth and Eleventh additional Circuits was by constitutional au-

thorization but not constitutional creation, thus attempting to distinguish between the original eight Circuit Judges provided for in the Constitution and the additional Circuit Judges who were to be appointed for the four additional circuits of legislative creation or establishment.

I also expressed the view that in the language of the constitutional amendment to Section 35 of Article V there was no inhibition upon the Legislature in the matter of providing for the appointment of two additional Judges for any one or more of the additional circuits created by legislative enactments in 1911 and in 1915.

The view expressed in that dissenting opinion was that as the additional judicial circuits were of legislative creation under express constitutional authority the additional judges and additional circuits might at any time be abolished by the Legislature whenever the necessities or requirements of the State made it expedient to do so. This view was not adopted by the Court so the Act of 1915 was declared "unconstitutional and inoperative."

Those decisions were rendered by this Corut in July, 1915. Following them, the people again amended the Constitution relating to Circuit Judges as follows:

"The Legislature may from time to time and as the business of' any Circuit requires, provide for the appointment of one or more additional Circuit Judges for such Circuit. Each such additional Circuit Judge shall be appointed by the Governor and confirmed by the Senate, and hold office for six years, and shall receive the same salary and allowances for expenses as other Circuit Judges. He shall have all the powers and perform all the duties that are or may be provided or prescribed by the Constitution or by statute for Circuit Judges, and all statutes concerning Circuit Judges shall apply to him. Wherever there are

two or more Circuit Judges appointed for a Circuit the business may be divided among the Circuit Judges having jurisdiction in the Circuit and in any county in the Circuit as may be prescribed by law, and where no provision has been made by law, the distribution of the business of the Circuit between the Circuit Judges of the Circuit, and of any county in the Circuit, and the allotment or assignment of matters and cases to be heard, decided, ordered, tried, decreed or adjuged, shall be controlled or made when necessary by the Circuit Judge holding the commission earliest in date. No additional Circuit Judge or Judges shall be authorized to be appointed in a Circuit having less than 75,000 inhabitants by the last Federal or State census occurring next before the passage of the law for his or their appointment. The Legislature may repeal any law providing for the appointment of an additional Circuit Judge, or additional Circuit Judges for a Circuit, but such repeal shall not affect the term, salary and jurisdiction of a Judge holding an appointment." Sec. 43, Art. V.

This amendment was adopted by the people at the general election in 1922.

This Court in the case of State, *ex rel.* West, v. Butler, *supra,* used the following language:

"The terms, the history and the governmental application of our Constitution establish a system of Circuit Courts with one Judge for each Circuit, and the amendments adopted clearly show an intent to continue and extend the established system by increasing the number of Judicial Circuits with one Judge for each Circuit, as was done pursuant to amended Section 35, by Chapter 6197, Acts of 1911, which in effect created three additional Judicial Circuits with one Judge for each Circuit. Chapter 6197 is a contemporaneous legislative construction of the meaning of amended Section 35. This being the supreme law of the

land on the subject, the Legislature and the courts have no power to change or vary the paramount law to meet conditions in a particular section of the State, however desirable a change there of such system may be. The Constitution makes provision for its amendment; and the amendments made disclose no intent to depart from the system of Circuit Courts originally established. This system expressly provides for 'one judge' in each Circuit." 70 Fla., text 133.

This language can have no other meaning than that the establishment of additional circuits and providing for additional judges therefor was an enlargement of the original constitutionally provided system of eight circuits and eight judges therefor, one to each circuit. It follows, therefore, from the decisions of the court that additional judges and judges as originally provided for in the system prior to the amendments are of equal dignity and jurisdiction; that there is no distinction between any of them in power, jurisdiction, dignity, term of office and salary, and that the provisions of the Constitution relating to the power of the Legislature to prescribe the compensation of justices and judges of the several courts apply alike and with equal force to all judges of the Circuit Courts both original and additional.

In 1927, by Chapter 12440, the Legislature of Florida created the additional Twenty-Seventh Judicial Circuit. The relator in this case was, in June, 1929, appointed Judge for that Circuit, and thus became an additional Judge of one of the additional Circuits.

Section 43 of Art. V of the Constitution, hereinabove quoted empowers the Legislature to repeal any law providing for the appointment of an additional Circuit Judge or additional Circuit Judges for a Circuit, but expressly prohibiting the Legislature by any such Act for affecting

"the term, salary and jurisdiction of a Judge holding an appointment."

When the Act of 1931, Chapter 15720, and the Act of 1933, Chapter 15859, reducing the compensation of Circuit Judges were passed the relator was a Judge holding an appointment. He held the appointment of Judge of the additional Twenty-Seventh Circuit.

If the judges of all the Circuit Courts are of equal power and jurisdiction and are upon a parity in point of term, salary and tenure of office then it follows that the provisions of Section 43 of Art. V are applicable alike to all judges holding commissions, and if the term of office, jurisdiction and salary of such judges may not be interfered with by repealing any law providing for the appointment of an additional circuit judge or additional circuit judges for a circuit how may it be contended that by an Act relating only to the salary of a judge holding a commission that salary may be diminished during his term of office when the words "Term, salary and jurisdiction" are placed in the same category of matters with which the Legislature is expressly prohibited from interfering?

If the Legislature is not thus expressly prohibited from diminishing the salary of a judge holding an appointment, how can it be logically maintained that it may not also diminish the term of office and interfere with the jurisdiction of a judge holding an appointment?

It is true that Section 8 of Article V provides that the term of office of each judge shall be six years, which is an implied inhibition upon the Legislature from diminishing that term, but Section 43 expressly prohibits the Legislature from abolishing the term of a judge holding a commission and places in the same category of prohibited matters his "salary and jurisdiction," but if by judicial interpreta-

tion it may be said that Section 43 applies only to additional circuits and additional judges yet the inhibition against interference by the Legislature with either the term, salary or jurisdiction applied to the judge of the Twenty-Seventh Circuit, which was an additional circuit and he an additional judge therefore holding a commission.

It would thus appear to be unsound reasoning to say that an Act dealing only with the interference with the salary of a judge holding a commission may be a valid Act while an Act repealing the appointment of such a judge may not interfere with either his term, salary or jurisdiction.

The learned author of the majority opinion states:

"The writer was a member of the· House of Representatives that submitted the 1914 Amendment authorizing the Legislature to prescribe the compensation of Circuit Judges and Justices of the Supreme Court. The Legislature had several times considered the matter of raising these salaries but they were fixed in the Constitution and a raise could be affected only by constitutional amendment. One of the arguments urged in favor of the amendment was that the Legislature could be trusted to prescribe judicial salaries, that there was no reason for retaining a fixed salary in the Constitution; so the provision for it was deliberately left out and the question of fixing judicial salaries vested in the Legislature."

However clearly the learned Jurist may remember the arguments and debates in the House of Representatives when the proposed amendment to the Florida Constitution, Art. V, Sec. 1, was submitted in the year 1913, it is universally conceded by all jurists that the arguments and discussions, which are carried on in the Constitutional Convention and in the Legislature when amendments to the Constitution are proposed, afford no safe guide to the interpretation of the text of the Constitution or the amend-

ments thereto which are adopted by the people, but the language used must carry the interpretation which the legitimate and recognized rules of construction of such instruments require. As was aptly said by the Supreme Court of Pennsylvania, in Com. v. Matheus, *supra,* Vol. 210, page 392:

"The views expressed by members of the convention, as set forth in the ·debates of the constitutional convention and the report of the committee as to changes made by the new Constitution, cannot be resorted to in order to arrive at a judicial interpretation of any part of the Constitution, if a sensible interpretation of the part in question can be made under the usual rules of judicial construction. This is on the principle that the final draft of the Constitution is what the people adopted, not the preliminary debates leading up to it, or the construction put upon it by the members of the convention afterwards: Com. v. Balph, 111 Pa. 365; Maxwell v. Dow, 176 U. S. 581, (20 Sup. Ct. Repr. 448); Bank v. Com., 19 Pa. 144; County of Cumberland v. Boyd, 113 Pa. 52."

Anyone may just as appropriately state that he was present when the Commission of Circuit and Supreme Court Judges met in the Court room of the Supreme Court Building in the year 1913 and drafted the proposed amendment to Section 1 of Article V, which was afterwards adopted by the Legislature of 1913 and became the amendment referred to in the majority opinion, and that during the discussion it was definitely pointed out by one or two of the Judges who advocated the adoption of the amendment that the word "prescribe" would constitute a definite and precise limitation upon the power of the Legislature to diminish the salary of a judge during his term of office because the word carried the meaning, as defined by Webster, that it was the power to "lay down authoritatively as a guide,

direction or rule of action; to impose as a peremptory order; to keep within limits or bounds," if indeed it did not convey the idea that it was the power to determine before the commencement of the term of office what the salary should be.

The Justice writing the majority opinion stated in relation to judicial salaries:

"The Courts are however in agreement that unless secured by constitutional fiat similar to that contained in Section 1, Article III, Federal Constitution, the compensation of the judiciary may be raised or lowered at the discretion of the Legislature. It is not secured on the theory of contract, the independence of the departments, or on any other theory. Neither is there an inherent right in a member of the judiciary to have his salary continued at the figure he found it when he assumed office. The question of Judicial salary is one of policy and is not saved from legislative invasion unless clearly provided or reasonably inferred from the terms of the Constitution."

That pronouncement is not supported by any authority whatsoever and indeed it is contrary to the accepted theory of the American Government, both Federal and State, which divides the sovereign powers of the Government into three separate and independent departments. It is contrary to the expressions of opinion as hereinbefore shown by the framers of the Federal Constitution and as exhibited in nearly every State Constitution of the United States, which, if they do not expressly provide against interference by the Legislature with adequate compensation for the judiciary, contain words strongly indicative of such policy. It is the very point in this controversy and necessary to be established by authority and precedent to sustain the defence of the respondent, whose duty, under Chapter 12440, Laws of 1927, creating the Twenty-Seventh Circuit, it is to pay to

the incumbent of the office the salary which had then been prescribed by the Legislature to be paid to such judge.

In the able opinion by Mr. Justice von Moschzisker, in the Matheus case, *supra*, it is clearly pointed out that although there was an omission from the new Constitution of 1873 of the words contained in the older Constitutions providing specifically against a reduction of salaries, the guaranty of the Constitution secured by the word *adequate* as related to the compensation to be paid was completely sufficient to place upon the Legislature of Pennsylvania an inhibition against the reduction of judicial salaries during the term of office of the incumbent affected by such reduction, and it was said by that Justice that while the question was not before the Court the members of it were emphatically of the opinion that the Legislature had no power to diminish the salary of a judge during the time for which he may have been elected.

The learned author of the majority opinion also states that the 1914 amendment "places the judiciary in the same category as the other Constitutional departments." That statement is also without any authority cited in support of it, but on the contrary it is definitely contradictory of the opinion of the Supreme Court of Pennsylvania in the Mathues case, *supra*.

The case of State, *ex rel.* Russell, v. Barnes, 25 Fla. 76, 5 South. Rep. 698, is no authority for any position taken in this case either by relator or by the respondent.

In the cited case Honorable A. J. Russell was the Superintendent of Public Instruction under the Constitution of 1868 as amended in 1871, which fixed his compensation at $2,000 a year and continued him in office as the Superintendent of Public Instruction under the Constitution of 1885, which went into effect in January, 1887, and which in express terms fixed the compensation of the Superintendent

of Public Instruction at $1,500. The Supreme Court merely decided that the provisions of the new instrument in relation to the salary of the Superintendent of Public Instruction were binding upon the Legislature and superior to a general appropriation Act enacted after the new Constitution went into effect, which made indirect provision for payment of a salary of $2,000 per annum to the Superintendent of Public Instruction.

The question of whether a contractual relation between the Superintendent and the State was established when the Superintendent entered upon the office under the old Constitution and continued notwithstanding the adoption of a new Constitution in 1887, was not discussed and indeed it would have been futile to have undertaken to support the position that a contractual relation of that nature existing under the old Constitution could possibly have survived the transition of the government into a new Constitution complete in all its provisions, reorganizing the State under a new government.

The general rule adopted by most of the jurisdictions is that the compensation of the judges cannot be changed during their term of office. See Evans v. Gore, 253 U. S. 245, 40 Sup. Ct. Rep. 550, 64 L. Ed. 887; *Ex parte* Tully, 4 Ark. 220, 38 Am. Dec. 33; People, *ex rel.* Johnson, v. Duden, 18 Cal. 696; Chancellor's Case, 1 Bland. 595; State v. Porter, 57 Mont. 343, 188 Pac. Rep. 375; Peo. v. Haws, 32 Barb. 207, 11 Abb. Pr. 261, 20 How. Pr. 29.

In some of these citations there were express and in others implied limitations upon the legislative power in this regard, but I have undertaken to show that in the Constitution of the State of Florida the limitation is not only implied, but it is expressed.

I do agree, however, to the following language employed in the majority opinion upon the question of estoppel which

is sought to be raised against the relator. "Neither are we convinced that Relator is precluded by estoppel from raising the question adjudicated." I am definitely of the opinion that estoppel will not lie against the relator in this matter, even if properly raised.

Holding to these views, I am of the opinion that the motion to quash the alternative writ should be denied.

BUFORD, J. (concurring specially).—I concur in the conclusion reached by Mr. Chief Justice ELLIS, but I think the power does not rest in the Legislature either to reduce or to increase the salary of a judge so as to be effective during the term for which such judge was appointed or elected. If the Legislature has such power then in the exercise of the power in either way it must be used to thwart the independence of the Judiciary.